691 F.2d 678
 71 A.L.R.Fed. 704, 1982-83 Trade Cases 64,992
 HOSPITAL BUILDING COMPANY, Appellee,
v.
TRUSTEES OF the REX HOSPITAL, a Corporation; Joseph Barnes;
Richard Urquhart, Jr., Appellants,
North Carolina Hospital Association and The State of North
Carolina, Amici Curiae.
 No. 81-1134.
 United States Court of Appeals,
Fourth Circuit.
 Argued Nov. 2, 1981.
Decided Oct. 19, 1982.
 
 Ray S. Bolze, Washington, D. C. (Mark W. Pennak, Ronald K. Perkowski, Howrey & Simon, Washington, D. C., Thomas W. Steed, Jr., Noah H. Huffstetler, III, Allen, Steed & Allen, P. A., Raleigh, N. C., on brief), for appellants.
 John K. Train, III, Atlanta, Ga. (Frank G. Smith, III, Leah J. Sears-Collins, Alston, Miller & Gaines, Charles Gordon Brown, Atlanta, Ga., John R. Jordan, Jr., Jerry S. Alvis, William M. Trott, Young, Moore, Henderson & Alvis, Raleigh, N. C. on brief), for appellee.
 W. C. Harris, Jr., Harris, Cheshire, Leager & Southern, Raleigh, N. C., on brief, for amicus North Carolina Hospital Ass'n.
 Rufus L. Edmisten, Atty. Gen. of N. C., William F. O'Connell, Sp. Deputy Atty. Gen., Robert L. Hillman, Asst. Atty. Gen., Raleigh, N. C., on brief, for amicus curiae The State of North Carolina.
 Before HALL, PHILLIPS and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 This appeal is from a $7.3 million dollar treble damages judgment against appellants Trustees of Rex Hospital, Joseph Barnes and Richard Urquhart, Jr. The judgment was entered after a six week jury trial in the District Court for the Eastern District of North Carolina. The jury returned a verdict for appellee Hospital Building Company ("HBC") on its claims under sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.[1]
 
 
 2
 Appellants seek reversal of the judgment below on grounds that: (1) the district court applied an incorrect per se rule of antitrust liability; (2) appellants' opposition to HBC's certificate of need application is protected from antitrust liability under the Noerr-Pennington doctrine; (3) HBC failed to prove "antitrust damages" or to establish that the alleged antitrust violations proximately caused HBC's alleged injuries; and (4) HBC was not prepared to enter the Raleigh, North Carolina area in-patient services market in 1972. Appellants urge this court to remand the action for entrance of judgment notwithstanding the verdict or, in the alternative, to remand for a new trial.
 
 
 3
 * HBC is a proprietary North Carolina corporation organized in 1946 to operate Mary Elizabeth Hospital in Raleigh, North Carolina. Rex Hospital is a non-profit hospital established in Raleigh in 1840. The trustees of Rex Hospital are appointed by the Raleigh City Council. At all times relevant to HBC's claims, Joseph Barnes was the chief executive officer of Rex Hospital and Richard Urquhart, Jr. was vice-chairman of the Board of Trustees of Rex Hospital.
 
 
 4
 HBC offered evidence that appellants met with representatives of Blue Cross/Blue Shield Association of North Carolina and others in October of 1970 and conspired to discourage proprietary competition in the North Carolina in-patient health services market. HBC's proof shows that in 1969 Rex and Wake Memorial Hospitals organized an ad hoc committee of 26 Raleigh citizens to study the need for in-patient health services in the Raleigh area. It is HBC's position that the committee, officially known as the Joint Long-Range Hospital Planning Committee of Wake County ("Joint Committee"), was controlled by representatives of Rex Hospital, Wake Memorial Hospital and Blue Cross/Blue Shield.
 
 
 5
 A national proprietary hospital chain, Charter Medical Corporation, acquired HBC in December of 1970. Shortly thereafter Charter Medical announced plans to expand Mary Elizabeth Hospital, proposing either to enlarge it, or perhaps to build a new, much larger hospital elsewhere in Raleigh.
 
 
 6
 In May of 1971, the Joint Committee issued its report on the demand for hospital services in the Raleigh area. The report recommended that by 1980 Wake Memorial should expand from 340 to 540 beds and that Rex Hospital build a new 500 bed hospital to replace its then existing facility. The report also contemplated HBC expanding Mary Elizabeth from 40 to 60 beds.
 
 
 7
 On July 21, 1971, the North Carolina Legislature enacted a certificate of need law, requiring persons to obtain state agency approval of any expansion of in-patient facilities prior to commencing construction of the new facility. On November 1, 1971 HBC filed an application to replace the existing 49 bed Mary Elizabeth Hospital with a new 140 bed general proprietary hospital.[2]
 
 
 8
 HBC asserts it proved that the co-conspirators formulated a primary and a secondary plan for halting HBC's plans to expand Mary Elizabeth Hospital. The primary plan, HBC asserts, was to kill the planned expansion by keeping HBC from receiving a certificate of need for construction of its new hospital. The secondary plan HBC attempted to prove was imposition of a discriminatory reimbursement schedule to reduce HBC's profits.
 
 
 9
 HBC's application for a certificate of need was initially referred to the Health Planning Council of Central North Carolina ("Central Planning Council"). HBC offered evidence that appellants, with the aid of the chairman of the Central Planning Council, were able to dominate the council and subvert it to their own purposes. The Central Planning Council denied HBC's application on January 5, 1972.
 
 
 10
 HBC appealed the Central Planning Council's decision to the North Carolina Medical Care Commission ("MCC"), where HBC asserts that Rex, Blue Cross/Blue Shield, the Central Planning Council, and others conspired to have the MCC reject the application. The application, according to HBC, met all the criteria for issuance of the desired certificate of need. When the MCC granted HBC's application on May 5, 1972, HBC asserts that the conspirators saw that they could not secure rejection of HBC's application. The primary plan of opposing expansion of proprietary hospital services then shifted from an attempt to secure rejection of the application to attempts to tie up the application administratively in hopes that a series of administrative delays would kill the planned expansion.
 
 
 11
 The Central Planning Council successfully petitioned for a rehearing before the MCC. On June 30, 1972 the MCC reaffirmed its decision to grant HBC's application. On July 28, 1972 the Central Planning Council appealed the MCC's decision granting the certificate of need to the Wake County Superior Court. This appeal was mooted on January 26, 1973 when the North Carolina Supreme Court struck down the North Carolina certificate of need law as violative of the state's Constitution.
 
 
 12
 After the certificate of need law was declared unconstitutional, HBC claims the co-conspirators shifted to a secondary plan of frustrating HBC's attempts to construct a new hospital. This plan, HBC argued, involved imposition of a discriminatory reimbursement formula on HBC and another proprietary hospital operating in North Carolina. Under this alleged plan, Blue Cross/Blue Shield limited the amount of insurance reimbursement proprietary hospitals received.
 
 
 13
 HBC claims that the delay engendered by the co-conspirator's primary plan and the later discriminatory reimbursement prevented it from starting construction on the new hospital until 1977. At trial HBC was awarded damages for profits lost due to delay in the opening of the hospital, increases in construction costs over the period of the delay and increases in equipment costs over the period of the delay.
 
 II
 
 14
 Under current antitrust standards, certain recurring business practices, "because of their pernicious effect on competition," are considered illegal per se under the Sherman Act. See e.g., United States v. Topco Associates, Inc., 405 U.S. 596, 607-608, 92 S.Ct. 1126, 1133-1134, 31 L.Ed.2d 515 (1972) and Northern Pacific R. Co. v. United States, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). On its face, § 1 of the Sherman Act appears to bar any combination of enterpreneurs so long as it is "in restraint of trade." In lieu of such a broad interpretation of § 1, the Supreme Court adopted a "rule of reason" analysis for determining whether most business combinations or contracts violate the prohibitions of the Sherman Act. United States v. Topco Associates, Inc., supra, 405 U.S. at 606-07, 92 S.Ct. at 1132-1133. The practical difference between a per se offense and a rule of reason offense is that under the per se rule, anticompetitive impact of the alleged offense is presumed, while under the rule of reason, its anticompetitive impact must be proven. Arizona v. Maricopa County Medical Society, --- U.S. ----, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982).[3] The violations HBC asserts it proved in this case-horizontal market allocation scheme and a concerted refusal to deal-are generally per se violations of the antitrust laws. United States v. Topco, supra; and Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959).
 
 
 15
 Federal and state laws, enacted at the time the instant antitrust violations are alleged to have occurred, indicate that governmental authorities considered oversupply of health care services and maldistribution of in-patient health care facilities as substantial roadblocks to more cost effective operation of the health services market. In an effort to contain these costs, both state and federal authorities advocated state and local health care planning.
 
 
 16
 Congressional action on health care planning and control originated with enactment of the Hill-Burton Act of 1946, Pub.L. No. 79-725, 60 Stat. 1040 (1946) (codified in scattered sections of 5, 8, 14, 24, 31, 33, 42, 46, 48 and 49 U.S.C.) (1976). The program initiated by the Act was designed to alleviate deficiencies in the supply and distribution of health care facilities. The Act provided state agencies with an initial grant to survey and study hospital needs, with federal funds thereafter made available to participating states to construct, expand or modernize according to the survey.
 
 
 17
 By the mid-1960's Congress had become more concerned with oversupply of hospital services in specific localities. In 1964 it amended the Hill-Burton Act to provide fifty percent of the cost of comprehensive regional, metropolitan area, or other local area plans for coordination of existing and planned health care facilities. Hospital and Medical Care Facilities Amendments of 1964, Pub.L. No. 88-443, § 318, 78 Stat. 447 (1964) (codified in 42 U.S.C. §§ 247c, 291-291o) (1970 and 1976). This funding was intended to prevent construction of facilities "which are not needed or are poorly located" and to avoid "the unnecessary duplication of services and facilities." S.Rept. No. 1279, 88th Cong., 2d Sess. 3 (1964).
 
 
 18
 In 1966 Congress enacted the Comprehensive Health Planning Act, Pub.L. No. 89-749, 80 Stat. 1180 (1966) (codified in 42 U.S.C. §§ 242g, 243, 246 and 247a) (1976). This act encouraged state and local planning agencies to draw plans for development of health care facilities, to review federal grants for health services and to participate in the planning and development of health care needs. The act required the state to:
 
 
 19
 (d) provide for encouraging cooperative efforts among governmental or nongovernmental agencies, organizations and groups concerned with health services, facilities, or manpower, and for cooperative efforts between such agencies, organizations, and groups ... in the fields of education, welfare, and rehabilitation. (emphasis added). § 314(a)(2)(D) (codified in 42 U.S.C. § 246(a)(2)(D)) (1976).
 
 
 20
 The House Report stated that approved state plans "must provide for cooperative efforts among governmental or nongovernmental health agencies and groups" upon pain of losing federal funding. H.R.No. 2271, 89th Cong. 2d Sess. at 12 (1966) (emphasis added).
 
 
 21
 As noted above, the North Carolina legislature enacted a certificate of need law on July 21, 1971. 1971 N.C.Sess.Laws. Ch. 1164 § 90-289. In 1972, Congress enacted the § 1122 amendments to the Social Security Act. Social Security Amendments of 1972, Pub.L. No. 92-603, 86 Stat. 1329 (1972) (codified in scattered sections of 42, U.S.C.) (1976). The thrust of these amendments was to require a determination of need for any proposed health facilities prior to construction. Reimbursement under medicare and medicaid was conditioned on approval of the new construction.
 
 
 22
 According to appellants, the above enactments "established a 'public policy contemplating' that the Health Planning Council, the defendants and other persons concerned with health care, participate in precisely the sort of planning efforts engaged in by the Committee." Appellants argue that since these planning activities fell "within the scope and purposes" of federal legislation, the activities were exempt from the antitrust laws.
 
 
 23
 None of the above mentioned health planning legislation contains an express exemption from the antitrust laws. Therefore, any exception from the antitrust laws must be implied. As the Supreme Court recently noted in National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City, 452 U.S. 378, 388-89, 101 S.Ct. 2415, 2421-2422, 69 L.Ed.2d 89 (1981):
 
 
 24
 The antitrust laws represent a "fundamental national economic policy." Carnation Co. v. Pacific Westbound Conference, 383 U.S. 213, 218 (86 S.Ct. 781, 784, 15 L.Ed.2d 709) (1966); see Lafayette v. Louisiana Power & Light Co., 435 U.S. 389, 398-399 (98 S.Ct. 1123, 1129, 55 L.Ed.2d 364) (1978). "Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." United States v. National Association of Securities Dealers, 422 U.S. 694, 719-720 (95 S.Ct. 2427, 2442-2443, 45 L.Ed.2d 486) (1975); see Gordon v. New York Stock Exchange, 422 U.S. 659, 682 (95 S.Ct. 2598, 2611, 45 L.Ed.2d 463) (1975); United States v. Philadelphia National Bank, 374 U.S. 321, 350-351 (83 S.Ct. 1715, 1734, 10 L.Ed.2d 915) (1963). "Repeal is to be regarded as implied only if necessary to make the (subsequent law) work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes." Silver v. New York Stock Exchange, 373 U.S. 341, 357 (83 S.Ct. 1246, 1257, 10 L.Ed.2d 389) (1963).
 
 
 25
 HBC argues that none of these enactments "provides for self-regulation by the hospital industry." While these acts do not mandate participation by local hospitals or their administrators, participation by private health care providers is clearly anticipated and we think desirable. It would be wasteful, and potentially impossible to engage in local health care planning without drawing on the expertise of local hospital administrators and physicians.
 
 
 26
 We think a very narrow "rule of reason" is required in order to permit defendants to show, if they can, that participation in certain planning activities that would otherwise violate § 1 might not under the circumstances have been an unreasonable restraint on trade. The appropriate rule, we find, is simply that planning activities of private health services providers are not "unreasonable" restraints under § 1 if undertaken in good faith and if their actual and intended effects lay within those envisioned by specific federal legislation in place at the time of the challenged activities as desirable consequences of such planning activities. See, Silver v. New York Stock Exchange, 373 U.S. 341, 360-61, 83 S.Ct. 1246, 1258-1259, 10 L.Ed.2d 389 (1963).
 
 
 27
 The scope and purpose of such legislation must, of course, be determined in order to apply this rule of reason since it must be given to the trier of fact as the benchmark by which reasonableness of conduct is to be gauged. This is a question of law-of statutory interpretation-for the courts, and because it is properly before us on this appeal, it is appropriate for us to decide it for application in further proceedings in this case.
 
 
 28
 The type and extent of participation in planning by health care providers that Congress envisioned in the statutes relied upon by defendants here is not altogether clear, but it is clear that what was envisioned was merely encouraged and authorized and not mandated. See, Hospital and Medical Facilities Amendments of 1964, supra; S.Rept. No. 1279, 88th Cong., 2d Sess. 3 (1964); Partnership for Health Amendments of 1967, Pub.L. No. 90-174, 81 Stat. 533 (1967) (codified in scattered sections of 42 U.S.C.) (1970 and 1976); S.Rept. No. 724, 90th Cong., 1st Sess. 3 (1967); Heart Disease, Cancer, Stroke & Kidney Disease Amendments of 1970, Pub.L. No. 91-515, 84 Stat. 1297 (1970) (codified in scattered sections of 42 U.S.C. (1976); H.Rept. No. 91-1297, 91st Cong., 2d Sess. 12 (1970); Medical Facilities Construction & Modernization Amendments of 1970, Pub.L. No. 91-296, 84 Stat. 336 (1970) (codified in scattered sections of 12, 21 and 42 U.S.C.) (1970 and 1976); and S.Rept. No. 92-657, 91st Cong., 2d Sess. 13 (1970). This suggests a fairly narrow interpretation of the range of the conduct that may properly be given an effect in derogation of normal operation of the antitrust laws. Cf. National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City, 452 U.S. 378, 393 n. 18, 101 S.Ct. 2415, 2423 n.18, 69 L.Ed.2d 89 (1981); Silver v. New York Stock Exchange, supra.
 
 
 29
 So construing the statutory authorization relied upon here we find it runs only to good faith participation in planning activities aimed at avoiding the needless duplication of health care resources in an affected area. See e.g., Hospital and Medical Facilities Amendments of 1964, supra, and S.Rept. No. 1279, 88th Cong., 2d Sess. 3 (1964). Obviously it cannot be interpreted to allow the blanket use of "planning" as a means by which some health care providers act to avoid competition by others for any other purpose and on any other justification. See Hospital Building Company v. Trustees of Rex Hospital, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Specifically we hold that "planning" under this special rule of reason is not "reasonable" if its purpose or effect is only to protect existing health care providers from the competitive threat of potential entrants into or expanders within the same "market."
 
 
 30
 The critical question in application of this rule is likely always to be whether the "duplication of resources" sought to be avoided by planning-almost inevitably a feature of any planning activity challenged by an outsider seeking entry or an insider seeking expansion-is in fact "needless" duplication. Proper application of the rule requires that whether it is "needless" or "needful" be gauged by the fact-finder in relation to the health care needs of the consumer public in the market area at the time in question, objectively assessed, and not in relation to the economic or other needs of the "planners", either objectively or subjectively assessed.
 
 
 31
 Because on this view the relevant federal health care legislation is in limited derogation of the normal operation of the antitrust laws, we further think that the burden of proof to show reasonableness of challenged planning activities under this special rule of reason should be allocated as an affirmative defense to defendants seeking on this ground to avoid antitrust liability. On this basis a claimant, such as plaintiff here, makes out a prima facie case by showing acts that, but for the health care planning legislation, would constitute a per se violation of § 1 under traditional antitrust principles. This establishes liability for appropriate damages unless the defendants then persuade the trier of fact by a preponderance of the evidence that their planning activities had the purpose (and effect if plaintiff proves anticompetitive effects) only of avoiding a "needless" duplication of health care resources under the objective standard of need above defined.
 
 
 32
 While this affirmative defense is concededly a narrow one that may be thought to involve only a modest practical modification of the per se rule applied below, defendants are entitled in further proceedings to have it applied to the extent the evidence on retrial may justify. Accordingly, we find that the judgment below for HBC must be reversed and the case remanded for a new trial applying the above rule of reason rather than a strict per se basis of antitrust liability.[4] Since the matter must be retried, we now address the additional issues raised by the parties that are relevant to a new trial.
 
 III
 
 33
 Appellants dispute whether the illegal conduct allegedly attributable to them falls within the so-called sham exception to Noerr-Pennington antitrust immunity.[5] HBC asserts it offered proof: (1) that appellants, aided by the chairman of the Central Planning Council, appropriated the powers of the council, effectively denying HBC meaningful access to the Central Planning Council; (2) that appellants engaged in spurious litigation before the MCC and the Wake County Superior Court to further the conspiracy by delaying approval of HBC's application for a certificate of need; (3) that appellants suborned the neutrality of an assistant attorney general of North Carolina assigned to act as counsel for the MCC; and (4) that appellants made numerous misrepresentations to government officials in their efforts to defeat HBC's application.
 
 
 34
 Actions taken to discourage and ultimately prevent competitors from meaningful access to the processes of administrative agencies fall within the sham exception to Noerr-Pennington immunity. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 512-513, 92 S.Ct. 609, 612-613, 30 L.Ed.2d 642 (1972). Thus, proof that appellants conspired to bring the chairman of the Central Planning Council and an assistant attorney general into their conspiracy, with the intent to foreclose HBC from meaningful access to the Central Planning Council and the MCC, is within the sham exception to Noerr-Pennington. Federal Prescription Service, Inc. v. American Pharmaceutical Assn., 663 F.2d 253 (D.C.Cir.1981). In California Motor Transport Co., supra, the court stated that when the proof establishes "a pattern of baseless, repetitive claims ... which leads the factfinder to conclude that the administrative and judicial processes have been abused", Id. 404 U.S. at 513, 92 S.Ct. at 613, such actions are not entitled to antitrust immunity. As noted in Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia, 624 F.2d 476, 482 n.9 (4th Cir. 1980), the critical inquiry with respect to alleged frivolous litigation is whether the challenged litigation is undertaken with intent to interfere directly with a competitor's business. See, California Motor Transport Co., supra, 404 U.S. at 511, 92 S.Ct. at 612. We believe that appellants are not immune from antitrust liability if the proof establishes they were engaged in a baseless appeal to the Superior Court of Wake County with intent to delay approval of HBC's application for a certificate of need and thereby delay its entrance into the Raleigh market.
 
 
 35
 Appellants raise several objections to Judge Maletz's charge on Noerr-Pennington immunity. We agree with appellants that misrepresentations, to fall within the sham exception to Noerr-Pennington immunity, must be made with the requisite intent. In these circumstances, for example, misrepresentations made with intent to abuse the administrative processes so as to deny HBC meaningful access to the MCC would fall within the sham exception.
 
 
 36
 At page 27 of its instructions the court says that "conduct in abuse of the adjudicatory or judicial process which is part of a larger conspiracy to restrain trade or to monopolize a market is not immune from the antitrust laws." We are unprepared at this time to approve such an unnecessarily broad definition of the sham exception. As noted above, HBC asserts that it proved a conspiracy to deny it meaningful access to the Central Planning Council and that it proved appellants undertook fruitless appeals solely to delay approval of HBC's application. We find that proof of misrepresentations made with this type of intent clearly falls within the sham exception to Noerr-Pennington, but hesitate at this time to rule that any act accompanying a larger conspiracy in restraint of trade, which also may be fairly characterized as "abuse of process," falls within the sham exception. See Pennington, supra, 381 U.S. at 670, 85 S.Ct. at 1593.
 
 
 37
 At page 28 of its instructions the court states: "If the courts are used or litigation is filed as part of an overall scheme to attempt to monopolize or exclude competition from the marketplace or otherwise violate the antitrust laws, that conduct does not enjoy antitrust immunity." This charge is erroneous in light of California Motor Transport Co., supra, which extends Noerr-Pennington immunity to the adjudicatory setting. There is still a sham exception applicable to judicial proceedings, if such proceedings are baseless, repetitive and brought with the intent to abuse the judicial process.
 
 
 38
 In its capacity as amicus curiae, the State of North Carolina asserts that the district court erred in allowing the jury to infer that an assistant attorney general was a member of the alleged conspiracy. As noted above, the State of North Carolina has encouraged hospital planning as a mechanism for controlling costs in the in-patient health services market. The attorney general of North Carolina is charged with representing the public interest at hearings before government agencies, including those engaged in health services planning. If an assistant attorney general appears before a government planning agency, a jury should not be allowed to infer that the assistant attorney general was a part of an alleged antitrust conspiracy involving that planning council unless there is some specific evidence the official was not merely performing his or her assigned duties. Cf., Comfort Trane Air Conditioning Co. v. Trane Co., 592 F.2d 1373 (5th Cir. 1979) (affirming a directed verdict on the basis of overwhelming evidence of independent business purpose).
 
 
 39
 The attorney general of North Carolina asked assistant attorney general Christine Denson to meet with representatives of the Central Planning Council to insure that its witnesses were properly presented at the hearing before the MCC. The Central Planning Council opposed HBC's application for a certificate of need as it was statutorily authorized to do. The evidence indicated that the attorney general's office doubted that the Central Planning Council's participation in the hearing would be effective unless it received assistance from a state attorney. Denson was asked to insure that the MCC's decision was based on a full record. Pursuant to these instructions, Denson offered to assist both HBC and the Central Planning Council in preparing proposed findings of fact. Only the Central Planning Council asked for assistance.
 
 
 40
 On the basis of this evidence the district court allowed the jury to conclude that Denson participated in the illegal conspiracy. We do not believe that HBC has offered sufficient evidence that Denson was not merely fulfilling her duties as an assistant attorney general and was instead knowingly contributing to the illegal conspiracy by assisting the Central Planning Council in its attempts to prevail before the MCC. Absent more telling evidence, a jury should not be permitted to infer that an assistant attorney general was a participant in an antitrust conspiracy.
 
 IV
 
 41
 Since introduction of the rule of reason into this action changes the standard of liability, the court below will, of course, once again address the issue of proximate cause on remand. Appellants raised the issue of proximate cause in this appeal, and we believe some discussion of this issue will be helpful upon remand.
 
 
 42
 HBC claims that the damage award it received below was based on the following sequence of events: (1) appellants' opposition to HBC's application delayed construction of the hospital until February 9, 1973, the date the North Carolina certificate of need law was declared unconstitutional; (2) the § 1122 amendments to the Social Security Act further delayed HBC until May 11, 1973, when federal approval under § 1122 was granted; and (3) rising interest rates, other unfavorable financial conditions and Blue Cross/Blue Shield's discriminatory reimbursements prevented HBC from resecuring a line of credit for construction of the new hospital until after its initial line of credit expired in June of 1973. Appellants claim HBC failed to prove "antitrust damages" or to establish that its alleged damages were proximately caused by the alleged antitrust violations.
 
 
 43
 Turning first to the proximate cause issue, HBC alleged, and apparently the jury believed, that appellants had initially attempted to prevent HBC from receiving a certificate of need and later, after it became apparent that the MCC was going to grant HBC a certificate of need, that appellants attempted to delay the granting of the certificate of need by engaging HBC in further proceedings before the MCC and in an appeal before the Wake County Superior Court. An obvious motivation of such delaying tactics is the hope that during the interim, an unforeseen occurrence will discourage or prevent the opposing party from realizing its plans. Appellants can hardly claim to have been surprised in this case by two intervening acts, Congressional enactment of the § 1122 amendments to the Social Security Act and the interest rate increases. These could have prevented HBC from beginning construction until 1977. Accordingly, we reject the appellants' contentions that these occurrences were intervening causes of the damages and that a jury could not find that the damages flowed from the alleged antitrust violations.[6]
 
 
 44
 The concept of "antitrust injury" is derived from the decision in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). In Brunswick, a company manufacturing and supplying bowling equipment acquired several bowling centers. A number of competing bowling centers brought an action against the manufacturer and supplier alleging a violation of § 7 of the Clayton Act. The injuries claimed by the plaintiffs were lost profits that would have been realized by the plaintiffs if the manufacturer had not purchased the bowling centers but instead had allowed them to go out of business as the plaintiffs alleged they would.
 
 
 45
 What made the acquisition of the bowling centers arguably unlawful under the antitrust laws was the manufacturer's potential to use its admittedly overpowering financial resources to undercut the competing bowling center, a so-called "deep pocket" offense. Since plaintiffs had no evidence that the manufacturer and supplier had attempted to undercut them, plaintiffs could prove no damages flowing from the alleged illegality and were left to assert loss of profits that would have accrued to their benefit had the competing bowling centers been allowed to go out of business.
 
 
 46
 The Supreme Court found these alleged lost profits were not injury of the type that the violated antitrust law was designed to prevent and they were not damages of the type that the claimed violations would be likely to cause.[7] Appellants, in the instant appeal, assert that the damages HBC seeks in this action flow from enactment of § 1122 and from rising interest rates rather than from the alleged unlawful acts of appellants. We reject this argument. As was noted in the above discussion of proximate cause, delay in HBC's ability to enter the Raleigh hospital market is precisely the type of injury that the alleged "allocation of the market" and "refusal to deal" were likely to cause and appellants cannot escape liability merely because the injurious delay was compounded by enactment of the § 1122 amendments and rising interest rates.
 
 V
 
 47
 Since it is not affected by our ruling on the rule of reason and, thus, will not be addressed again on remand, we also dispose of the issue of HBC's preparedness to enter the Raleigh area hospital market. Appellants contend that the record supports a finding that HBC could not have obtained the approval of North Carolina authorities for its 6.88 acre "Tucker" site and that HBC was not as a matter of law prepared to enter the Raleigh area hospital market in 1972. Entrance of judgment notwithstanding the verdict is not proper since the issue was hotly contested at trial, with considerable evidence being introduced to support both positions. We also believe that the question of whether to send a special interrogatory to the jury on this issue was within the discretion of the trial judge. Tights, Inc. v. Acme-McCrary Corp., 541 F.2d 1047, 1060 (4th Cir.), cert. denied, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976).
 
 VI
 
 48
 Although the issue was not raised in the briefs, at argument, HBC asserted the verdict below should be sustained even assuming the rule of reason applies to its § 1 claims. In support of this assertion HBC argued that any error in applying a per se rule to its § 1 cause of action did not render objectionable its recovery under its § 2 causes of action.
 
 
 49
 Section 2 of the Sherman Act supports three distinct causes of action: (1) monopolization, (2) attempt to monopolize and (3) conspiracy to monopolize. HBC sought recovery under the latter two causes of action, attempt and conspiracy. The district court correctly charged that an element of both of these offenses is specific intent to monopolize. American Football League v. National Football League, 205 F.Supp. 60, 64-65 (D.Md.1962), aff'd 323 F.2d 124 (4th Cir. 1963).
 
 
 50
 Proof that the transactions in question were primarily motivated by legitimate business purposes rather than by specific intent to monopolize is a defense to both attempt to monopolize and conspiracy to monopolize. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 627, 73 S.Ct. 872, 890, 97 L.Ed. 1277 (1953), and American Football League, supra at 132-33.
 
 
 51
 A literal application of the legitimate business purposes defense, developed in more traditional commercial market cases, does not, however, readily lend itself to application by a jury to health care planners. The analogous defense, and the one appellants should be permitted to pursue below, is one like that we have formulated for § 1 claims. Proof that the defendants in this action were primarily motivated by intent to avoid a "needless" duplication of health care resources would be a defense to HBC's § 2 claims. In the instant case the district court charged the jury that "it is no defense to a ... conspiracy to monopolize and an attempt to monopolize that the acts complained of may have been undertaken with what defendants believe to be proper motives. A claim of good motives cannot justify or excuse a violation of the antitrust laws, and would be no defense in this case."
 
 
 52
 We believe the charge is clearly erroneous in light of the defendants' right to prove that they were motivated by intent to avoid "needless" duplication rather than specific intent to monopolize. Defendants made a timely objection to this charge and argued on brief that the § 2 as well as the § 1 causes of action should be reversed. Plaintiffs § 2 causes of action, therefore, are reversed.
 
 
 53
 Accordingly, judgment for HBC on appellants' counterclaims is affirmed; judgment for HBC on its claims under §§ 1 and 2 of the Sherman Act is reversed and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 This matter is before us for a second time. HBC's action was initially dismissed for failure to state a claim affecting interstate commerce. A panel of this court affirmed. Dismissal was upheld again on rehearing en banc, Hospital Building Company v. Trustees of Rex Hospital, 511 F.2d 678 (4th Cir. 1975). The United States Supreme Court granted certiorari, 423 U.S. 820, 96 S.Ct. 33, 46 L.Ed.2d 37 (1975), and reversed, ruling that the complaint alleges a restraint of trade substantially affecting interstate commerce. 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)
 
 
 [2]
 Mary Elizabeth Hospital apparently had 49 beds when the application was filed. The Joint Planning Committee proceeded on the assumption that Mary Elizabeth had only 40 beds
 
 
 [3]
 The United States Supreme Court decided the Maricopa County case after argument in this matter had been heard. We recognize that Maricopa County applies the per se rule to allegations of price fixing in the health care industry. Unlike Maricopa County the instant case does not involve price fixing. Furthermore, the limited application given the rule of reason in this case is justified on much different and narrower grounds than those discussed in Maricopa County
 
 
 [4]
 Appellants also seek a new trial on their counterclaims for abuse of process and libel. Since appellants have asserted no error with respect to the trial of these issues, and since the retrial of the antitrust issues will be sufficiently complicated without introducing these additional issues, judgment for HBC on appellants' counterclaims is affirmed
 
 
 [5]
 In Eastern Railroads Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Supreme Court established that no violation of the antitrust laws can be predicated upon attempts to influence the passage or enforcement of laws, even if efforts in that regard are based upon anti-competitive motives
 
 
 [6]
 This ruling, of course, does not relieve HBC of the burden of proving that appellants' attempts to delay construction of the new hospital were violative of the Sherman Act under the rule of reason
 
 
 [7]
 See Chief Judge Winter's discussion of the ruling in Brunswick in Lee-Moore Oil Company v. Union Oil Company of California, 599 F.2d 1299, 1302-1304 (4th Cir. 1979)