## NATIONAL GERIMEDICAL HOSPITAL AND GERONTOLOGY CENTER *v.* BLUE CROSS OF KANSAS CITY ET AL.

No. 80–802.   Argued April 29, 1981—Decided June 15, 1981

POWELL, J., delivered the opinion for a unanimous Court.

*Erwin N. Griswold* argued the cause for petitioner. With him on the briefs were *Joe Sims* and *James M. Beck.*

*Joshua F. Greenberg* argued the cause for respondents. With him on the brief were *Abraham Ribicoff, Richard M. Steuer, Harry P. Thomson, Jr., Jennifer A. Gille, John C. Noonan,* and *Max O. Bagley.*

*Solicitor General McCree* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Acting Assistant Attorney General Favretto, Dep-*

*uty Solicitor General Wallace, Stephen M. Shapiro, Barry Grossman,* and *Andrea Limmer.**

JUSTICE POWELL delivered the opinion of the Court.

The petitioner in this case, National Gerimedical Hospital and Gerontology Center (National Gerimedical) filed an antitrust suit against respondents, Blue Cross of Kansas City (Blue Cross) and the national Blue Cross Association, challenging the refusal of Blue Cross to accept petitioner as a participating member provider under its health insurance plan. The issue presented here is whether this refusal by Blue Cross is immunized from antitrust scrutiny because it was intended to aid implementation of the plans of the "health systems agency" designated for the Kansas City area under the National Health Planning and Resources Development Act of 1974.

I

Petitioner National Gerimedical is a private, acute-care community hospital opened in 1978 in the Kansas City, Mo., metropolitan area.[1] Prior to the completion of construction, petitioner sought to enter into a participating hospital agreement with Blue Cross, a nonprofit provider of individual and group health-care reimbursement plans in Missouri and Kansas. Under such an agreement, participating hospitals receive direct reimbursement of the full costs of covered services rendered to individual Blue Cross subscribers.[2] When subscribers receive care in hospitals that are not participating members, Blue Cross pays only 80% of the cost, and these payments are made to the subscriber, rather than directly to the hospital.

---

*Carl Weissburg* and *J. Mark Waxman* filed a brief for the Federation of American Hospitals as *amicus curiae* urging reversal.

[1] As a Missouri hospital, petitioner has been licensed by the Missouri Division of Health since September 1977. It also has been certified as a Medicare provider by the Department of Health and Human Services.

[2] All other acute-care hospitals in the Blue Cross service area are participating members.

Blue Cross refused to enter into a participating hospital agreement with petitioner on the basis of its official policy barring participation by any new hospital that could not show that it was meeting "a clearly evident need for health care services in its defined service area." [3] In determining that petitioner had not satisfied this requirement, Blue Cross relied on petitioner's failure to obtain approval for construction from the local "health systems agency" or "HSA"—the Mid-America Health Systems Agency (MAHSA). [4] This agency is a private, nonprofit corporation, federally funded under the National Health Planning and Resources Development Act of 1974 (NHPRDA), 88 Stat. 2229, as amended, 42 U. S. C. § 300l (1976 ed. and Supp. IV). Its major function is health planning for the Kansas City metropolitan area.

In conducting its planning functions, MAHSA had determined that there was a surplus of hospital beds in the area

---

[3] On January 1, 1976, Blue Cross issued a summary of "Prerequisites" by which it would be guided in deciding whether to accept new participating hospitals. App. 141a. These included the following:

"The hospital must meet a clearly evident need for health care services in its defined service area. Health care institutions and institutional services shall be approved, and/or if required by law, certified as necessary, by the designated planning agency or areawide health planning agency respectively; or, when effective, by the designated State Agency as provided for in Public Law 93–641, the 'National Health Planning and Resources Development Act of 1974.'" *Id.*, at 146a.

Blue Cross added that it retained the final discretion in deciding whether to accept a new hospital, and then included a warning to those contemplating new construction:

"Because lack of knowledge by any applicant of this requirement shall not be considered sufficient reason for waiving it, community groups contemplating construction of new hospitals are urged to consult with Blue Cross, if they expect to apply for participation in the hospital service plan, at some time well in advance of actual construction." *Ibid.*

[4] See n. 3, *supra.* In a newsletter issued on July 21, 1976, Blue Cross announced that "[a]ll projects not reviewed and approved by these Health Systems Agencies will not be reimbursable by Blue Cross of Kansas City." App. 147a.

and had announced that it would not approve any addition of acute-care beds in area hospitals. As a result of this announced policy, petitioner did not seek MAHSA approval of its construction, leading to the refusal of participating hospital status by Blue Cross.

Claiming that this refusal by Blue Cross put it at a competitive disadvantage, petitioner filed suit in the United States District Court for the Western District of Missouri against Blue Cross and the national Blue Cross Association. It claimed violations of §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1, 2, alleging a wrongful refusal to deal and a conspiracy between Blue Cross and MAHSA.[5] As relief, petitioner sought treble damages and an injunction to prevent future violations.

Respondents moved to dismiss the complaint on the ground that the NHPRDA had impliedly repealed the antitrust laws as applied to the conduct in question.[6] The District Court treated this motion as one for summary judgment, and granted judgment for respondents. 479 F. Supp. 1012 (1979). It reasoned that if private parties seeking to effectuate the planning objectives of an HSA could be subjected to antitrust liability, accomplishment of the goals of the NHPRDA would be frustrated. *Id.,* at 1021. Having found a "clear repugnancy," *id.,* at 1024, between this Act and the antitrust laws, the court relied largely on legislative history for the view that "Congress intended that action taken pursuant to the Act and clearly within the scope of the Act would be exempt from application of the antitrust laws," *ibid.*

---

[5] MAHSA was not named as a defendant. Petitioner also included claims under Missouri's antitrust laws.

[6] Respondents also argued, unsuccessfully, that their conduct was immune from antitrust attack under the McCarran-Ferguson Act, 15 U. S. C. § 1011 *et seq.,* that their prepaid medical plans are not part of "trade or commerce" within the meaning of the Sherman Act, and that the allegations of conspiracy were insufficient. These claims are not before this Court.

The United States Court of Appeals for the Eighth Circuit affirmed, essentially adopting the reasoning of the District Court. 628 F. 2d 1050 (1980). The Court of Appeals agreed with the District Court's "finding of clear repugnancy between the Act and the antitrust laws, as the Act and regulatory scheme clearly call for the action which has now become the basis of an antitrust claim." *Id.*, at 1055–1056. It then quoted in full the District Court's argument for the view that Congress intended repeal of the antitrust laws in this context.

We granted a writ of certiorari to review this important question. 449 U. S. 1123 (1981).

## II

Our decision in this case requires careful attention to the structure and goals of the NHPRDA, as well as a review of this Court's decisions in the area of implied repeals of the antitrust laws. We begin with a description of the complex scheme of regulatory and planning agencies established by the NHPRDA in order to assess the legal significance of that Act with respect to the antitrust claim brought here.

MAHSA, the health systems agency whose refusal to approve new hospital construction in the Kansas City area prompted Blue Cross not to accept petitioner as a participating hospital, is but one part of a larger statutory scheme. The NHPRDA, 42 U. S. C. § 300k *et seq.*, created federal, state, and local bodies that coordinate their activities in the area of health planning and policy. Building on existing planning and development statutes,[7] Congress sought in 1974

---

[7] See generally S. Rep. No. 93–1285, pp. 4–39 (1974) (hereinafter 1974 Senate Report). In 1972, for example, Congress passed § 1122 of the Social Security Act, 42 U. S. C. § 1320a–1, which authorizes the Secretary of Health and Human Services to enter into agreements with willing States, under which a state agency would be designated as the appropriate body for approving capital expenditures in the health-care area. Under § 1122, federal reimbursements under programs including Medicare and

to create a statutory scheme that would assist in preventing overinvestment in and maldistribution of health facilities. See 1974 Senate Report, at 39.

HSA's such as MAHSA are concerned with health planning in a particular metropolitan area. See generally H. R. Rep. No. 93–1382, pp. 40–41 (1974). Each is a nonprofit private corporation, public regional planning body, or single unit of local government, serving a particular "health service area." 42 U. S. C. § 300*l*–1 (b)(1). The statute requires that a majority of HSA board members be consumers of health care and that at least 40% be health-care "providers." § 300*l*–1 (b)(3)(C). The "primary responsibility" of each HSA is "effective health planning for its health service area and the promotion of the development within the area of health services, manpower, and facilities which meet identified needs, reduce documented inefficiencies, and implement the health plans of the agency." § 300*l*–2 (a). As originally enacted, the Act established four general goals: "improving the health of residents," "increasing the accessibility . . . , acceptability, continuity, and quality of . . . health services," "restraining increases in the cost of . . . health services," and "'preventing unnecessary duplication of health resources." § 300*l*–2 (a).[8] To accomplish these goals, the Act requires each HSA to formulate a "detailed statement of goals" called a "health systems plan," § 300*l*–2 (b)(2), an "annual implementation plan" describing the objectives that will achieve the goals of the general plan, § 300*l*–2 (b)(3),

Medicaid do not include the capital expenses of hospitals that have not received agency approval.

In 1976, Missouri chose not to renew its agreement with the Federal Government under § 1122, thus eliminating the previous state program for approval of hospital construction. Brief for Respondents 6, n. 6.

[8] The Health Planning and Resources Development Amendments of 1979 (1979 Amendments), Pub. L. 96–79, § 103 (c), 93 Stat. 595, added another goal, "preserving and improving . . . competition in the health service area." 42 U. S. C. § 300*l*–2 (a)(5) (1976 ed., Supp. IV).

and "specific plans and projects for achieving the objectives established in the" annual implementation plan, § 300*l*–2 (b) (4). Each HSA is instructed to "seek, to the extent practicable, to implement [its plans] with the assistance of individuals and public and private entities in its health service area." § 300*l*–2 (c)(1). In addition, it may provide "technical assistance" to individuals and public and private entities for the development of necessary projects and programs, § 300*l*–2 (c)(2), and should use grants and contracts to encourage these projects and programs, § 300*l*–2 (c)(3). The agencies do not possess regulatory authority over health-care providers.

At the state level, the Act created two separate bodies. The first, a State Health Planning and Development Agency, is a state agency created by agreement between a Governor and the Federal Government. See § 300m. It is intended to perform certain crucial functions that cannot be undertaken by local HSA's:

> "Specifically, the integration and synthesis of areawide health plans into a Statewide health plan, the establishment of priorities within the State, and the performance of regulatory functions are most appropriately carried out at the State level. The latter function can appropriately be carried out only by an agency of State government." 1974 Senate Report, at 52.

Each state agency must be governed by a "State Program," which the Secretary of Health and Human Services may approve only if it meets guidelines set out in 42 U. S. C. §§ 300m–1, 300m–2. Included in these guidelines is the requirement that each State establish a "certificate of need" program under which all new institutional health facilities must seek state approval prior to construction. § 300m–2 (a)(4)(A).[9] This procedure is "the basic component in an

---

[9] The Act provides for reductions in various federal grants to States that do not participate in the planning process. 42 U. S. C. § 300m (d).

overall effort to control the unnecessary capital expenditures which contribute so greatly to the total national health bill." S. Rep. No. 96–96, p. 5 (1979) (hereinafter 1979 Senate Report).

The State Health Planning and Development Agency is advised by a Statewide Health Coordinating Council, composed in part of representatives of local HSA's. This council is empowered to review the plans of HSA's, review and revise state plans, and make recommendations with respect to applications for federal funds from HSA's and States. 42 U. S. C. § 300m–3 (c).

In addition to various review functions, the Federal Government plays a separate role in this statutory scheme. The NHPRDA requires the Secretary of Health and Human Services to issue guidelines concerning the appropriate supply, distribution, and organization of health resources. § 300k–1; see 42 CFR § 121.1 *et seq.* (1980). Finally, the Act created a National Council on Health Planning and Development to advise the Secretary on these guidelines and on the general administration of the Act. 42 U. S. C. § 300k–3.

This elaborate planning structure was intended by Congress to remedy perceived deficiencies in the performance of the health-care industry as it existed prior to 1974. The problems addressed fall into two categories. First, there was concern that marketplace forces in this industry failed to produce efficient investment in facilities and to minimize the costs of health care.[10] In addition, Congress sought to reduce the maldistribution of health-care facilities.[11]

---

[10] As the 1974 Senate Report put it:

"The need for strengthened and coordinated planning for personal health services is growing more apparent each day. In the view of the Committee the health care industry does not respond to classic marketplace forces. The highly technical nature of medical services together with the growth of third party reimbursement mechanisms act to attenu-

In 1979, Congress amended the NHPRDA substantially in the Health Planning and Resources Development Amendments of 1979, Pub. L. 96–79, 93 Stat. 592. A purpose of these Amendments was to "[d]irect that special consideration be given throughout the planning process to the importance of maintaining and improving competition in the health industry." 1979 Senate Report, at 3.[12] Toward this end, Congress added a number of provisions requiring promotion of competition at the local, state, and federal levels. 42 U. S. C. §§ 300k–2 (b), 300*l*–2 (a)(5) (1976 ed., Supp. IV); 42 U. S. C. §§ 300n–1 (c)(11), (12) (1976 ed., Supp. IV). See generally H. R. Conf. Rep. No. 96–420, p. 58 (1979). In so doing, however, Congress recognized a distinction between areas where competition could serve a useful purpose and

ate the usual forces influencing the behavior of consumers with respect to personal health services. . . .

"Investment in costly health care resources, such as hospital beds, coronary care units or radio-isotope treatment centers is frequently made without regard to the existence of similar facilities or equipment already operating in an area. Investment in costly facilities and equipment not only results in capital accumulation, but establishes an ongoing demand for payment to support those services. . . .

"A recently published study indicates that by 1975, over 67,000 unneeded hospital beds will be in operation throughout the United States.

"Hospital beds, though unused, contribute substantial additional costs to the health care industry." 1974 Senate Report, at 39.

[11] The 1974 Senate Report stated:

"Widespread access and distribution problems exist with respect to medical facilities and services. In many urban areas, hospitals, clinics and other medical care institutions and services are crowded into relatively tiny sectors, while large areas go poorly served or completely unserved. Many rural communities are completely without a physician or any other type of health care service, while adjacent urban areas are oversupplied." *Ibid.*

[12] The Committee also sought to reduce the threat of domination of HSA decisionmaking by providers with a personal stake in the existing health-care system. 1979 Senate Report, at 57–59. See also Rosenblatt, Health Care Reform and Administrative Law: A Structural Approach, 88 Yale L. J. 243, 304–330 (1978) (describing problems of establishing consumer representation in HSA's).

those where some other allocation of resources remained necessary.[13]

### III

National Gerimedical contends that the denial by Blue Cross of participating hospital status violated the antitrust laws. Blue Cross defends on the ground that it acted pursuant to the local HSA plan and only intended to further the purposes of the NHPRDA. It argues that, despite the absence of any reference to the antitrust laws in the NHPRDA, the creation of the planning structure summarized above implied a repeal of those laws, as applied to this conduct.

On a number of occasions, this Court has faced similar claims of antitrust immunity in the context of various regulated industries. The general principles applicable to such claims are well established. The antitrust laws represent a "fundamental national economic policy." *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S. 213, 218 (1966); see *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389, 398– 399 (1978). "Implied antitrust immunity is not favored, and can be justified only by a convincing showing of clear repugnancy between the antitrust laws and the regulatory system." *United States* v. *National Association of Securities Dealers,* 422 U. S. 694, 719–720 (1975); see *Gordon* v. *New York Stock Exchange,* 422 U. S. 659, 682 (1975); *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 350–351

---

[13] In a new subsection, 42 U. S. C. § 300k–2 (b) (1) (1976 ed., Supp. IV), Congress made the finding that "the effect of competition on decisions of providers respecting the supply of health services and facilities is diminished," causing "duplication and excess supply of certain health services and facilities." It added that where "competition appropriately allocates supply consistent with health systems plans and State health plans," planning agencies should "give priority . . . to actions which would strengthen the effect of competition on the supply of such services." § 300k–2 (b) (3). But, for "health services, such as inpatient health services and other institutional health services, for which competition does not or will not appropriately allocate supply," agencies should "take actions . . . to allocate the supply of such services." § 300k–3 (b) (2).

(1963). "Repeal is to be regarded as implied only if necessary to make the [subsequent law] work, and even then only to the minimum extent necessary. This is the guiding principle to reconciliation of the two statutory schemes." *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 357 (1963).

To be sure, where Congress did intend to repeal the antitrust laws, that intent governs, *United States* v. *National Association of Securities Dealers, supra; Gordon* v. *New York Stock Exchange, supra,* but this intent must be clear. Even when an industry is regulated substantially, this does not necessarily evidence an intent to repeal the antitrust laws with respect to every action taken within the industry. *E. g., Otter Tail Power Co.* v. *United States,* 410 U. S. 366, 372–375 (1973); *United States* v. *Radio Corp. of America,* 358 U. S. 334, 346 (1959). Intent to repeal the antitrust laws is much clearer when a regulatory agency has been empowered to authorize or require the type of conduct under antitrust challenge. *E. g., United States* v. *National Association of Securities Dealers, supra,* at 730–734; *Gordon* v. *New York Stock Exchange, supra,* at 689–690.

In the present case, we must apply these precedents to an industry with a regulatory structure quite different from those considered previously. The action challenged here was neither compelled nor approved by any governmental, regulatory body. Instead, it was a spontaneous response to the finding of an advisory planning body, the local HSA, that there was a surplus of acute-care hospital beds in the Kansas City area.[14] Indeed, when respondents refused to enter into

---

[14] Significantly, the MAHSA health systems plan only called on insurers to create incentives to hold down the costs of care in *existing* institutions, and made no mention of a role for insurers in restraining unneeded hospital construction. The plan calls on the "reimbursement system [to] promote appropriate utilization of hospital services, provide positive incentives for efficient institutions, actively encourage utilization of less costly but equal quality alternatives to inpatient care, and develop uniform reimbursement programs." App. 67a. But it then asserts that "[c]apital

the agreement with petitioner, the *regulatory* aspects of the NHPRDA—controlled by the state health planning agencies—were not in place in Missouri. There simply was no regulation of this hospital construction, as Missouri had not established any state regulatory agency with authority to review hospital construction.[15]

As a result, the claim of implied antitrust immunity in this case is weaker than in previous cases. It cannot be argued that application of the antitrust laws to the conduct of Blue Cross would frustrate a particular provision of the NHPRDA or create a conflict with the orders of any regulatory body. The record discloses no formal request from MAHSA to Blue Cross to refrain from accepting petitioner as a new participating hospital. Even if such a request had been made, it could not have been more than the advice of a private planning body—albeit a planning body created and funded by the Federal Government. This fact is crucial, because antitrust repeals are especially disfavored where the antitrust implications of a business decision have not been considered by a governmental entity. *United States* v. *Radio Corp. of America, supra,* at 339, 346; cf. *Otter Tail, supra,* at 374 ("When . . . relationships are governed in the first instance by business judgment and not regulatory coercion, courts must be hesitant to conclude that Congress intended to override the fundamental national policies embodied in the antitrust laws").

---

investment in institutions [shall] be controlled by an appropriate review agency." *Ibid.*

[15] See n. 7, *supra.* If it had done so, this case probably would not have arisen. The state agency would have conditioned all hospital construction on issuance of a "certificate of need." See *supra,* at 385–386. Parties pursuing hospital construction without a certificate of need would now be subject to legal penalties. 42 U. S. C. § 300m–2 (a) (4) (A) (1976 ed., Supp. IV).

Missouri subsequently has established a state agency and enacted "certificate of need" legislation. Mo. Rev. Stat. § 197.300 *et seq.* (Supp. 1980).

Respondents rely on the fact that a major function of an HSA is planning in order to eliminate unnecessary duplication of hospital services, 42 U. S. C. § 300*l*–2 (a)(4) (1976 ed., Supp. IV), and point to statutory language requiring each HSA to "seek, to the extent practicable, to implement its [health plans] with the assistance of individuals and public and private entities in its health service area," § 300*l*–2 (c)(1). Here, respondents argue, the HSA found that petitioner was duplicating hospital facilities unnecessarily, and Blue Cross merely sought to aid in the "implementation" of that finding.

We are unpersuaded, however, that the provisions cited by respondents are sufficient to create a "clear repugnancy" between the NHPRDA and the antitrust laws, at least on the facts of this case. See n. 18, *infra*. Nothing in the NHPRDA requires Blue Cross to take an action that, in essence, sought to enforce the advisory decision of MAHSA. HSA's themselves are required to seek private cooperation only "to the extent practicable." 42 U. S. C. § 300*l*–2 (c)(1). And there is no reason to believe that Congress specifically contemplated such "enforcement" by private insurance providers, let alone relied on such actions to put "teeth" into the noncompulsory local planning process. Congress expected HSA planning to be implemented mainly through persuasion and cooperation. If an HSA recommendation could be used to justify antitrust immunity for such an act of private enforcement, this effectively would give that recommendation greater force than Congress intended.[16]

As there is no direct conflict between the requirements of the NHPRDA and the Sherman Act with respect to the conduct at issue here, respondents' only remaining argument must be that the NHPRDA immunizes all private conduct

---

[16] Congress knew how to give an HSA policy greater legal effect. Under 42 U. S. C. § 300*l*–2 (e) (1976 ed., Supp. IV), HSA approval—subject to review by the Secretary—is required for expenditures of funds under certain federal programs.

undertaken in response to the health planning process. Arguably, the fundamental assumption of Congress, particularly in 1974 when it passed the original Act,[17] was that competition was not a relevant consideration in the health-care industry. If so, although that industry is not regulated in any comprehensive fashion, it might be concluded that Congress intended "pervasive" cooperation and planning without the interference of antitrust suits.

This argument has some force, in light of the prominence Congress gave to the view that "the health care industry does not respond to classic marketplace forces." 1974 Senate Report, at 39. Perhaps it makes little sense in such a context to entertain antitrust suits intended to promote or protect free competition. It is clear, however, that respondents have failed to make the showing necessary for an exemption of all actions of health-care providers taken in response to planning recommendations. In other industrial contexts, we have refused such a blanket exemption, despite a clear congressional finding that some substitution of regulation for competition was necessary. *Carnation Co.* v. *Pacific Westbound Conference,* 383 U. S., at 217–219 (maritime industry); *Otter Tail,* 410 U. S., at 373–374 (electric power industry). These holdings are based on the guiding principle that, where possible, "the proper approach . . . is an analysis which reconciles the operation of both statutory schemes with one another rather than holding one completely ousted." *Silver,* 373 U. S., at 357. There is no indication that Congress intended a different result with respect to the health-care industry. One manifestation of this is the fact that in the 1979 Amendments Congress did not alter the basic planning structure, even as it made plain its intent that "competition and consumer choice" are to be favored wherever they "can constructively serve . . . to advance the purposes of quality

---

[17] As noted *supra,* at 387–388, in 1979 competition was given a more prominent place in the thinking of Congress.

assurance, cost effectiveness, and access." 42 U. S. C. § 300k–2 (a)(17) (1976 ed., Supp. IV).[18]

We hold, therefore, that the NHPRDA is not so incompatible with antitrust concerns as to create a "pervasive" repeal of the antitrust laws as applied to every action taken in response to the health-care planning process. Moreover, as discussed above, there was no specific conflict between the Act and the antitrust laws in this case. Although respondents may well have acted here with only the highest of motives in seeking to implement the plans of the local HSA, they cannot defeat petitioner's antitrust claim by the assertion of immunity from the requirements of the Sherman Act.[19] As a result, the judgment below must be reversed and the case remanded.

*It is so ordered.*

---

[18] Nevertheless, because Congress has remained convinced that competition does not operate effectively in some parts of the health-care industry, *e. g.*, 42 U. S. C. § 300k–2 (b) (1976 ed., Supp. IV), we emphasize that our holding does not foreclose future claims of antitrust immunity in other factual contexts. Although favoring a reversal in this case, the United States as *amicus curiae* asserts that "there are some activities that must, by implication, be immune from antitrust attack if HSAs and State Agencies are to exercise their authorized powers." Brief for United States as *Amicus Curiae* 16, n. 11. Where, for example, an HSA has expressly advocated a form of cost-saving cooperation among providers, it may be that antitrust immunity is "necessary to make the [NHPRDA] work." *Silver* v. *New York Stock Exchange,* 373 U. S. 341, 357 (1963). See 124 Cong. Rec. 34932 (1978) (Rep. Rogers) ("The intent of Congress was that HSA's and providers who voluntarily work with them in carrying out the HSA's statutory mandate should not be subject to the antitrust laws. If they were, Public Law 93–641 simply could not be implemented"). Such a case would differ substantially from the present one, where the conduct at issue is not cooperation among providers, but an insurer's refusal to deal with a provider that failed to heed the advice of an HSA.

[19] This holding does not, of course, suggest anything about the merits of the antitrust claim in this case. These matters remain to be litigated on remand, where the court should give attention to the particular economic context in which the alleged conspiracy and "refusal to deal" took place.