**TYPHOON CAR WASH, INC.,**
Plaintiff-Appellee,

v.

**MOBIL OIL CORPORATION,**
Defendant-Appellant.

No. 8–17.

Temporary Emergency Court of Appeals.

Argued Jan. 25, 1985.

Decided July 2, 1985.

Rehearing Denied Aug. 7, 1985.

Thomas C. Kayser, of Robins, Zelle, Larson & Kaplan, Minneapolis, Minn., and Robert C. Fox, Chicago, Ill., of counsel, were on the brief for defendant-appellant, Mobil Oil Corp.

Robert J. Hennessey, with whom Jon S. Swierzewski, of Larkin, Hoffman, Daly &

Lindgren, Ltd., Minneapolis, Minn., were on the brief for plaintiff-appellee, Typhoon Car Wash, Inc.

Before JAMESON, GRANT, and PECK, Judges.

GRANT, Judge.

Defendant-appellant, Mobil Oil Corporation, [hereinafter referred to as Mobil], appeals from the district court's granting of summary judgment to plaintiff-appellee, Typhoon Car Wash, Inc., [hereinafter referred to as Typhoon]. The district court awarded Typhoon $80,493 on its claims alleging that Mobil placed Typhoon in an improper class of purchaser and overcharged Typhoon for gasoline in violation of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751–760h (1976); $16,424.25 on Typhoon's claim alleging that Mobil violated the Emergency Petroleum Allocation Act of 1973 by discontinuing its practice of accepting the Master Charge and Visa credit card invoices of Typhoon's patrons as payment for gasoline purchased by Typhoon from Mobil; $45,000 for Typhoon's attorney's fees; and $24,466.20 for prejudgment interest. Mobil does not appeal the district court's entry of judgment on the credit card invoice issue. Because we find that Mobil did not place Typhoon in an improper class of purchaser, this Court reverses the district court's order and vacates the award to Typhoon based upon the improper classification as well as the awards of attorney's fees and prejudgment interest.

## Facts

The parties stipulated to the following facts:

Typhoon owns and operates three tunnel-type car washes in the Minneapolis-St. Paul, Minnesota area. Typhoon sells gasoline and car washes at each of its locations. Prior to 1977, Typhoon purchased for resale Sunray DX gasoline for which Typhoon received a discount of 2.65 cents per gallon. In early 1977, Typhoon learned that Sunray DX would not renew its contract to supply gasoline to one of Typhoon's car washes. Whereupon Typhoon began searching for a new supplier for all three of its car washes and approached Amoco, Mobil and Union 76.

Typhoon dismissed Amoco as a potential supplier because Amoco refused to service one of Typhoon's car washes and because Typhoon found the discount offered by Amoco to be too low. Typhoon pursued negotiations with Mobil and Union 76 seeking the highest competitive discount that it could get. Because Union 76 had withdrawn discounts from its customers when gasoline supplies had become limited in 1973 and 1974, Typhoon decided to solicit Mobil as its supplier of gasoline.

Before Mobil would grant Typhoon a competitive discount, Mobil required that Typhoon obtain a competing offer from another gasoline supplier. Typhoon obtained such an offer and informed Mobil by letter. Mobil and Typhoon then entered into five-year contracts for each of Typhoon's locations. The contracts provided that Typhoon would receive a competitive allowance of 2.25 cents per gallon off the regular dealer tankwagon price, that Mobil could reduce or withdraw the competitive allowance at any time upon thirty days written notice, and that Typhoon could terminate the agreement upon thirty days notice for a reduction or withdrawal of the allowance. Mobil began supplying Typhoon with gasoline from its St. Paul terminal in October 1977.

For pricing purposes, Mobil classified its customers at each of its supply terminals into three levels of purchasers: retail, wholesale distributors and commercial accounts. The retail level of purchaser included those dealers who owned their own stations or leased their stations from someone other than Mobil, and also, those dealers who leased their stations from Mobil. Mobil referred to the former group as N dealers and to the latter group as OG & L dealers. Typhoon became an N Dealer in the retail level class of purchaser. As of May 15, 1973, the date upon which the regulations required a supplier to maintain

its purchaser structure, 10 C.F.R. § 212.83 (1980), Mobil supplied 111 retail level purchasers with gasoline from its St. Paul terminal. Of those retail purchasers, seventy-nine operated as OG & L dealers and thirty-two as N dealers. Of the thirty-two N dealers, five owned and operated tunnel-type car washes, including Typhoon's three stations. All five N dealers who owned tunnel-type car washes received competitive allowances ranging from 2.25 to 3.0 cents per gallon as of May 15, 1973. Nineteen of the twenty-seven N service station dealers received competitive allowances ranging from 0.5 to 2.5 cents per gallon as of May 15, 1973. None of the seventy-nine OG & L dealers received competitive allowances. Mobil made no class of purchaser gradations among its retail level customers. Up to, and including, May 15, 1973, car wash dealers supplied by Mobil's St. Paul terminal sold significantly higher average annual volumes of gasoline than did non-car wash dealers.

During the summer of 1979, shortages developed in oil supplies and dramatically changed the competitive situation. Mobil decided to reduce Typhoon's competitive allowance to 1.75 cents per gallon on August 1, 1979 and, on October 1, 1979, withdrew the competitive allowance altogether.

In April 1980, Typhoon brought this action alleging that Mobil had overcharged it for gasoline by placing it in an improper class of purchaser in violation of the Emergency Petroleum Allocation Act of 1973, 15 U.S.C. §§ 751–760h. After discovery, the parties stipulated to the facts and submitted this matter to a United States magistrate on cross-motions for summary judgment.

In his first report and recommendation, the magistrate found that Mobil had placed Typhoon in an incorrect class of purchaser and, therefore, that Mobil failed to preserve the customary price differential that existed between N tunnel-type car washes and other retail level customers. The magistrate relied upon Ruling 1975–2, 40 Fed. Reg. 10,655 (1975). Example 7 of the Ruling requires car wash dealers who sell higher volumes of gasoline than non-car wash dealers, to be placed in a distinct class of purchase "because the higher volumes and the substantially greater investments in their (sic) stations of the car wash dealers are in themselves justifications under the Robinson-Patman Act for treating the car wash dealers differently." *Id.* at 10,660.[1] The magistrate recommended that the district court grant summary judgment in favor of Typhoon on those counts alleging the improper classification. After a *de novo* determination of that recommendation, the district court accepted it and granted summary judgment accordingly. We reverse.

*Statutory Background*

Congress passed the Emergency Petroleum Allocation Act of 1973 in reaction to the 1973 Arab oil embargo which threatened the United States "with the possibility of drastic shortages in crude oil supplies and spiralling of petroleum costs." H.R.Rep. No. 340, 94th Cong., 1st Sess. 51, *reprinted in* 1975 U.S.Code Cong. & Ad.News 1762, 1813. The bill focused "on the short term objectives of seeing to it that during times of shortage our priority [petroleum] needs are met and that whatever limited supplies we have are equitably distributed throughout the nation to meet regional needs and preserve competition in the marketplace." H.R.Rep. No. 531, 93d Cong., 1st Sess. *reprinted in* 1973 U.S.Code Cong. & Ad. News 2582, 2583. The Act imposed upon the President the duty to regulate the amounts and price at which crude oil, residual fuel oil, and refined petroleum products would be allocated. 15 U.S.C. § 753(a). The President delegated this authority to the Federal Energy Administration [hereinafter referred to as FEA].[2] Exec. Order No. 11,790, 39 Fed.Reg. 23,185 (1974).

---

**1.** Robinson-Patman Act, 15 U.S.C. §§ 13–13b, 21a (1976).

**2.** The Federal Energy Administration Act of 1974, Pub.L. No. 93–275, 88 Stat. 96, implemented by Exec. Order No. 11,790, 39 Fed.Reg. 23,-185 (1974), abolished the Federal Energy Office

Pursuant to its authority, the FEA issued Part 212—Mandatory Petroleum Price Regulations, 10 C.F.R. §§ 212.1–.188 (1980).[3] The Regulations prohibited a refiner from "charg[ing] to any class of purchaser a price for a covered product in excess of the maximum allowable price...." *Id.* at § 212.83(a). Maximum allowable price meant

> the weighted average price at which the covered product was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, computed in accordance with the provisions of § 212.-83(a), plus increased product costs and increased non-product costs incurred between the month of measurement and the month of May 1973.

*Id.* at § 212.82. A class of purchaser consisted of "purchasers to whom a person ha[d] charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers and other purchasers." *Id.* at 212.31. Customary price differentials "include[d] a price distinction based on a discount, allowance, add-on, premium, and an extra based on a difference in volume, grade, quality, or location or type of purchaser, or a term or condition of sale or delivery." *Id.*

To clarify the application of the class of purchaser concept, the FEA promulgated Ruling 1975–2, 40 Fed.Reg. 10,655. The ruling discussed the concept's general principles and then illustrated those principles with factual examples. The question in the instant case revolves around Example 7.[4]

*Issue*

This Court need address only one issue in its disposition of this appeal:

> The application of the class of purchaser doctrine here should be similar to its application in Example 5. Firm G is required to treat all 25 of the car wash dealers as being in the same class of purchaser and in a district class of purchaser from its 475 non-car wash dealers. This is so because the higher volumes and the substantially greater investments in their (sic) stations of the car wash dealers are in themselves justifications under the Robinson-Patman Act for treating the car wash dealers differently. Firm G is not required, however, to maintain separate classes of purchaser for those car wash dealers that had competitive discounts in effect on May 15, 1973, and those car wash dealers that did not, since those car wash dealers that had discounts in effect are distinguishable from other car wash dealers only in that they had received lower offers from a competitor of Firm G. Similarly, with the non-car wash class, Firm G need not maintain a separate class of purchaser for four non-car wash dealers that received discounts given only to meet competition. The May 15, 1973, lawful selling price component of Firm G's base price for the non-car wash class is therefore the weighted average of 15 cents per gallon for 471 dealers and the lower May 15, 1973, prices afforded to four dealers; the May 15, 1973, lawful selling price component of its base price for the car wash class of purchaser is the weighted average of 15 cents per gallon for five dealers and the lower May 15, 1973, prices afforded to the other 20 members of the class.

40 Fed.Reg. at 10,660.

and vested all authority delegated to the President by the Emergency Petroleum Allocation Act in the newly established FEA. The Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565 (1977), implemented by Exec. Order No. 12,009, 42 Fed.Reg. 46,267 (1977), gave the Department of Energy the responsibility for enforcing the pricing and allocating authority. Because the FEA promulgated the regulations before the Court in the instant case, this Court will refer to the agency responsible for construing and enforcing the price controls as the FEA.

3. Exec. Order No. 12,287. 46 Fed.Reg. 9,909 (1981) exempted crude oil and refined petroleum products from price and allocation regulations. The Economic Regulatory Administration implemented the decontrol order. 46 Fed. Reg. 20,508 (1981).

4. Example 7: On May 15, 1973, Firm G charged most of its 500 branded dealers a dealers tankwagon price of 15 cents per gallon for motor gasoline. Included in those dealers were 25 which sold gasoline in connection with car wash operations which they owned. Of the 25 car wash dealers, Firm G had given 20 of them various discounts, determined on an individual basis, to meet equally low offers of competitors. Similar competitive discounts were given to four of Firm G's non-car wash dealers. All of the 25 car wash dealers sold approximately equal volumes of gasoline, and all of them had substantially greater capital investments in their stations and sold higher volumes of gasoline than the rest of Firm G's dealers.

*Whether the FEA's regulations required Mobil to place Typhoon into a class of purchaser consisting of N tunnel-type car washes purchasing gasoline from Mobil's St. Paul, Minnesota terminal?*

The district court determined that Typhoon's car washes fell within the objective factors set forth in Ruling 1975–2, ex. 7 and concluded that Mobil had placed Typhoon in an improper class of purchaser, "because the instant case also involve[d] a plaintiff selling higher volumes, and making a substantially greater investment." *Mobil Oil Corporation v. Typhoon Car Wash, Inc.*, No. 4–80–257 at 18 (D.Minn. Oct. 28, 1983) (memorandum and order finding violation of Emergency Petroleum Allocation Act of 1973). The district court rejected Mobil's Robinson-Patman Act competitive discount defense and reasoned that a court need not concern itself with the antitrust laws once it found that example 7's factors had been met because the later enacted energy laws preempted the antitrust laws. The district court relied upon *Evanson v. Union Oil*, [1974–1980 Transfer Binder] Energy Mgmt. (CCH) ¶ 26,158 (D.Minn. July 31, 1979) which states in pertinent part:

> The nub of the matter is that if Union complied with ESA, EPAA, the regulations and Ruling 1975–2, it most likely did not violate the Robinson-Patman Act. If Union complied with ESA, EPAA, the regulations (sic) and Ruling 1975–2 but violated the Robinson-Patman Act in so acting, it does not incur antitrust liability since the later enacted regulatory scheme is pre-emptive of the antitrust laws in that situation. Therefore the antitrust laws are not implicated in this lawsuit....

*Id.* at 27,403. Such a broad application of the antitrust pre-emption in *Evanson* has no basis in the language of the regulation, in the legislative history or in the case itself.

First, Ruling 1975–2 provides that

> FEA's class of purchaser requirements are intended to be and should be con-

strued as being consistent with requirements of the Robinson-Patman Act. Thus, in determining whether a price differential in effect on May 15, 1973, was a customary differential which shall be maintained with respect to a class of purchaser, FEA will take into account whether the differential in question falls into one of the categories of differentials justified under the Robinson-Patman Act.

40 Fed.Reg. at 10,658. The categories of differentials to which the regulation refers consist of the cost justification defense, 15 U.S.C. § 13(a), and the meeting the competition, or the competitive discount, defense, 15 U.S.C. § 13(b). The language of the ruling, and its incorporation of the Robinson-Patman Act defenses, both militate against the pre-emption of the antitrust laws.

Second, the legislative history of the Emergency Petroleum Allocation Act of 1973 indicates that one of its short term objectives was to equitably distribute petroleum supplies to "preserve competition in the market place." H.R.Rep. No. 531, *supra*, 1973 U.S.Code Cong. & Ad.News at 2583. Thus, the Act seeks the same goal as the antitrust laws, that is, the preservation of competition, and its legislative history provides no basis for a broad pre-emption of the antitrust laws.

Finally, in holding that the antitrust laws were preempted in the particular case before it, the *Evanson* court found *Inter City Oil Co. v. Murphy Oil Corp.*, 1 Energy Mgmt. (CCH) ¶ 9722 (D.Minn. June 25, 1976) to be analogous because the *Inter City Oil* court had confronted precisely the same situation. *See Evanson*, [1974–1980 Transfer Binder] Energy Mgmt. (CCH) at 27,403. In addressing the applicability of the antitrust laws to a supplier of fuel oil who was charging the maximum amount allowed under FEA regulations, the *Inter City Oil* court held that "[i]n this *discrete and particularized realm*, antitrust immunity is preempted." *Inter City Oil*, 1 Energy Mgmt. (CCH) at 9795 (emphasis added). The court went on to note that "inso-

**1090**

far as the proper functioning of the regulations presupposes continued competition, antitrust scrutiny, rather than antitrust immunity, may be necessary to make the Act work." *Id.*

■ In addressing the applicability of the antitrust laws to the case now before us, we note that "[t]he antitrust laws represent a 'fundamental national economic policy.' " *National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City,* 452 U.S. 378, 388, 101 S.Ct. 2415, 2421, 69 L.Ed.2d 89 (1981) (citations omitted). The legislature did not expressly pre-empt the antitrust laws when it enacted the Emergency Petroleum Allocation Act and the courts do not favor an implied repeal of the antitrust laws. *See Id.* at 388, 101 S.Ct. at 2421; *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 682, 95 S.Ct. 2598, 2611, 45 L.Ed.2d 463 (1975). A regulatory scheme may impliedly repeal the antitrust laws if there is an affirmative showing of the legislative intent to repeal, which has not been shown here, or if the regulatory scheme and the antitrust laws are irreconcilable. *North Carolina ex rel. Edmisten v. P.I.A. Asheville, Inc.,* 740 F.2d 274, 280 (4th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1865, 85 L.Ed.2d 159 (1985). Irreconcilability means plain or clear repugnancy. "Where plain repugnancy does exist, the antitrust laws may be held repealed only to the minimum extent necessary to resolve the repugnancy,.... 'The guiding principle [is] reconciliation of the two statutory schemes,' ... rather than 'to oust completely the antitrust laws and supplant them' with the regulatory scheme...." *Id.* at 284 (citations omitted); *National Gerimedical Hospital,* 452 U.S. at 389, 101 S.Ct. at 2422. If co-existence is possible, the courts have a duty to regard each stat-

ute as effective. *North Carolina ex rel. Edmisten,* 740 F.2d at 284. Because no clear repugnancy exists between the antitrust laws and Ruling 1975–2 and because Ruling 1975–2 expressly incorporated the Robinson-Patman Act, the district court here improperly disregarded the antitrust laws in reaching its decision. The district court should have treated each statute as effective. We do so now.

In the instant case, Mobil offered Typhoon a discount of 2.25 cents in the face of a written competing offer from Union 76. When the competitive situation disappeared, Mobil withdrew the allowance.[5] Typhoon claims, and the district court found, that Typhoon, as a high-volume purchaser who had made a substantially greater investment in its stations, belonged in a class of purchaser entitled to receive the discount that it would have received from Mobil on May 15, 1973, because the discount which Typhoon was receiving was cost justified. Typhoon maintains that Ruling 1975–2 supports this position and cites the following language from the Ruling:

> It is important to point out, however, that certain discounts may have been "competitive discounts" in form, having ostensibly been granted to meet a lower offer and with an affidavit having been executed by the buyer to that effect, but may nevertheless also be cost justified under the Robinson-Patman Act....

> Thus, as a general rule the FEA will not require classes of purchaser to be established to maintain price differentials which on May 15, 1973, were in effect only to meet an equally low offer of a competitor. But the FEA will look behind broad assertions that a particular differential was a "competitive" discount and will determine whether in fact the differential was extended to meet a com-

---

**5.** The issue of law is clear. If the discounts were competitive allowances, Mobil was free to terminate them at any time. If the discounts were cost-justified customary price differentials, the price regulations forbid Mobil to withdraw them. The burden falls upon Typhoon to show

that the discounts it received from Mobil were cost-justified. *Reynolds Industries, Inc. v. Mobil Oil Corporation,* 741 F.2d 1385 (Temp.Emer.Ct. App.1984); *Mr. Magic Car Wash, Inc. v. Department of Energy,* 596 F.2d 1023 (Temp.Emer.Ct. App.1978).

petitive offer and, even if it was, whether it was equally justifiable on a cost basis. Where there is an equally strong cost justification for a "competitive" discount, FEA will require it to be continued.

40 Fed.Reg. at 10,658.

Here, Typhoon presented evidence that the cost of building a typical tunnel-type car wash significantly exceeded the cost of building a non-car wash service station and evidence that the five N tunnel-type car washes sold a higher average annual volume of gasoline than non-car wash service stations. The district court improperly concluded that this evidence met the requirements of Ruling 1975–2, ex. 7 and that the discount was cost justified, and thereupon granted summary judgment to Typhoon. However, such evidence does not suffice, as a matter of law, to show cost justification.

■ First, the cost of constructing, maintaining or owning a service station is not to be considered in determining whether a discount is cost justified. *See Pacific Service Stations Co. v. Mobil Oil Corporation*, 636 F.2d 306, 309 (Temp.Emer.Ct. App.1980) (citing *Templeton's Service, Inc. v. Mobil Oil Corporation*, 624 F.2d 1084 (Temp.Emer.Ct.App.1980)). A cost justified allowance means an allowance that reflects cost savings *to a supplier* due to " 'differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered....' " Ruling 1975–2, 40 Fed. Reg. at 10,658 (quoting Robinson-Patman Act, 15 U.S.C. § 13(a)). The additional costs associated with building a car wash (as opposed to a non-car wash service station) do not represent a cost saving *to a supplier* under the Robinson-Patman Act as incorporated by the regulations under the Emergency Petroleum Allocation Act.

■ Second, establishing a cost-justified class of purchaser based upon an average annual volume of petroleum purchased by the car-wash group would create artificial disparities between smaller individual purchasers in that favored group and large purchasers who had no car wash. *United States v. Borden Co.*, 370 U.S. 460, 469–70, 82 S.Ct. 1309, 1314, 8 L.Ed.2d 627 (1962). Further the Robinson-Patman Act requires that the party asserting cost justification based upon volume purchased must prove that the purchasers in the favored group placed larger individual orders than purchasers in the nonfavored group, because a seller, in establishing purchasers groups, may not assume that customers who purchase large volume annually also place large individual orders throughout the year. *Re Master Lock Company*, 27 F.T.C. 982, 991–92 (1938); *Re H.C. Brill Company, Inc.*, 26 F.T.C. 666, 678 (1938). The evidence presented by Typhoon shows only that the five N tunnel-type car washes sold higher average annual volumes of gasoline than did non-car wash service stations. Such evidence does not suffice to establish cost justification under the Robinson-Patman Act as incorporated by the regulations under the Emergency Petroleum Allocation Act.

Finally, some of the N service station dealers here involved received competitive discounts which exceeded the discounts received by some N tunnel-type car wash dealers.[6] This fact further convinces us that the N tunnel-type car washes here involved do not constitute a separate class of purchaser.

*Conclusion*

■ Typhoon admits that it received competitive offers from other suppliers before entering into contracts with Mobil. Nothing exists to indicate that the letters evidencing those offers were shams. Any

6. All five N tunnel-type car wash dealers received competitive allowances ranging from 2.25 to 3.0 cents per gallon as of May 15, 1973. Nineteen of the twenty-seven N car wash dealers received competitive allowances ranging from 0.5 to 2.5 cents per gallon. See *Facts, supra*, p. 1087.

supplier would have found Typhoon to be an attractive customer and would have had ample competitive basis for extending the discount that Mobil extended. The evidence fails to show that the discounts here extended by Mobil were cost justified under the Robinson-Patman Act as incorporated by the regulations under the Emergency Petroleum Allocation Act. This Court need not address the other issues raised by Typhoon.

The decision of the district court is RE-VERSED, its entry of judgment is VACAT-ED and the case is REMANDED for an entry of judgment consistent with this opinion.