MILLETT, Circuit Judge,
concurring:
I join the opinion of the court in full, including its two separate and independent holdings that the proposed merger would substantially reduce competition in (i) the national-accounts market and (ii) the large-group-employer market in Richmond. Indeed, as to the latter holding, all of Anthem’s and the dissenting opinion’s Sturm, und Drang over efficiencies is beside the point because the district court held that, even accepting all of Anthem’s claimed cost savings, the merger would still have substantial anticompetitive effects. United States v. Anthem, Civil Action No. 16-1493 (ABJ), — F.Supp.3d —, —, 2017 WL 685563, at *68 (D.D.C. Feb. 21, 2017).
With respect to the holding regarding the national-accounts market, I write separately only to underscore the foundational problems that pervade Anthem’s and the dissenting opinion’s insistence that any reduction in provider rates, standing alone, excuses an anticompetitive merger.
First, there is no dispute that, to have any legal relevance, a proffered efficiency cannot arise from anticompetitive effects. Dissenting Op. 378 (“Cognizable efficiencies * * * do not arise from anticompetitive reductions in output or service.”) (quoting Department op Justice & Federal Trade Comm’n, Horizontal Merger Guidelines § 10, at 30 (Aug. 19, 2010)). Rather, the proffered efficiencies, even if verifiable, must at least neutralize if not outweigh the harm caused by the loss of competition and innovation. Horizontal Merger Guidelines § 10, at 30 (“cognizable efficiencies” must “reverse the merger’s potential to harm customers in the relevant market”); see also 4A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 270e, at 36-40 (4th ed. 2016).
That means that once a court has found a Section 7 violation, a generic statement that prices will go down proves nothing by itself. Yet the dissenting opinion repeatedly hangs its hat on the government’s statement that the proposed merger will “lower” provider rates. See Dissenting Op. 373, 375, 379, 380-81. The government, however, never agreed with Anthem or the dissenting opinion’s assigned dollar amounts. Nor did it ever concede that (i) the reduction would be sufficiently large to offset the merger’s anticompetitive effects, (ii) the savings were obtainable only through merger, or (iii) the savings were verifiable.
In fact, all that the government stated was that any decrease in provider rates would come about through an exercise of unlawful market power. See J.A. 545. That would be an antitrust violation, not an efficiency. And that statement by the government hardly seems to merit “[l]in-ger[ing]” over, Dissenting Op. 373.
Second, what the dissenting opinion (at 379) labels as an “undeniable” predicate assumption — that any cost savings will necessarily be passed through to customers — not only is very much denied, Appellees’ Br. 58, but actually flies in the face of the factual record. As the district court found, a number of damaging internal Anthem documents detailed the company’s efforts and specific business options for actively preventing those savings from being passed through to customers and instead capturing the money for itself. Compare Dissenting Op. 373-74, 377, 379-80, with, e.g., Anthem, — F.Supp.3d at —, 2017 WL 685563, at *62 (“Anthem’s internal documents reflect that the company has been actively considering multiple scenarios for capturing any medical cost savings for itselfi.]”); J.A. 2159 (Anthem pres *370 entation, entitled “Overview of potential ASO value capture models,” states that “[p]ass[ing] all savings through to customers” is “not * * * optimal” because it fails to “capture most value from [the] deal”); Suppl. App’x 1863-1865, 1858, 1419, 463, 472 (sealed materials). It is right there in black and white.[1]
So the reason the opinion of the court does not “fully accept[]” the dissenting opinion’s “key fact[ ],” Dissenting Op. 379, is because the district court found it to be untrue. And given the content of the internal Anthem documents, that factual determination was not clearly erroneous.[2]
Third, context matters. Lower rates cannot be trumpeted without first asking what those lower rates will buy. The second half of the government’s statements about decreased provider rates was that they would lead to an inferior health care product, including reduced access to medical care and fewer doctors. Compl. ¶ 72; see also J.A. 545. The district court found as a matter of fact, and the opinion of the court rightly affirms, that customers would be paying less because they would be getting less in the form of a degraded Cigna product. Op. 360-62; Anthem, — F.Supp.3d at —, 2017 WL 685563, at *59 (crediting testimony that “imposing lower fee structures would unravel [Cigna’s] collaborative relationships with providers”); id. — F.Supp.3d at —, at *61; id. — F.Supp.3d at —, at *63 (“[T]here is ample evidence in the record that the merger would harm consumers by reducing or weakening the Cigna value based offerings which aim to reduce medical costs by reducing utilization and by engaging with, rather than simply reducing the fees paid to, providers.”).
Paying less to get less is not an efficiency; it is evidence of the anticompetitive consequences of reducing competition and eliminating an innovative competitor in a highly concentrated market.
Fourth, while the dissenting opinion repeatedly declares the record evidence “overwhelming[ ]” that the post-merger firm will deliver health care for less, e.g., Dissenting Op. 375, it bears emphasizing that one half of this merger disagrees. “In this case, the Department of Justice is not the only party raising questions about Anthem’s characterization of the outcome of the merger: one of the two merging parties” — Cigna—“is also actively warning against it.” Anthem, — F.Supp.3d at —, 2017 WL 685563, at *4. Importantly, “Cigna officials provided compelling testimony undermining the projections of future savings” that Anthem proffered and the dissenting opinion embraces. Id. (emphasis added).
Finally, the assumption that the prices paid by Anthem’s customers — whatever the quality of the resulting product — are the sole focus of antitrust law sits at the center of Anthem’s and the dissenting opinion’s contentions. But antitrust law is not so monocular. Rather, product variety, quality, innovation, and efficient market allocation — all increased through competition — are equally protected forms of consumer welfare. See Horizontal Merger Guidelines § 6.4, at 24.[3] Indeed, “with *371 draw[al of] a product that a significant number of customers strongly prefer to those products that would remain available * * * can constitute a harm to customers over and above any effects on the price or quality of any given product.” Id. That is why, under antitrust law, anticompetitive conduct that lowers prices can be illegal. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (“Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal per se”) (emphasis added).[4]
The dissenting opinion also founders on the mistaken belief that any exercise of increased bargaining power short of mon-opsony is procompetitive. But securing a product at a lower cost due to increased bargaining power is not a procompetitive efficiency when doing so “simply transfers income from supplier'to purchaser without any resource savings.” Areeda & Hovenkamp, supra, ¶ 975i, at 106. Plus, as Professors Areeda and Hovenkamp explain in language that speaks directly to Anthem’s proposed merger: “Congress may not have wanted anything to do with an efficiencies defense asserted by a firm that was already large or low cost within the market and to whom the efficiencies would give an even greater advantage over rivals.” Id. ¶ 970c, at 31.
Ultimately, the judicial task here is not to favor cost redistribution or any other economic agenda for its own sake. Congress has decided that any merger that “substantially * * * lessen[s] competition” is forbidden. 15 U.S.C. § 18. Our task is to enforce that legislative judgment. To allow a merger that has already been proven to “substantially * * * lessen competition,” id., to proceed anyhow because of some unverifiable and non-merger-specific amount of price decreases accruing to one segment of the health care market would rewrite rather than enforce the Clayton Act.[5]

.In addition, the dissenting opinion’s rosy forecast (at 8) that Anthem’s employer-customers would then automatically use those (unproven) savings to raise their employees’ pay is cut out of whole cloth. Not even Anthem offered up that Panglossian prediction.

. Curiously, none of the large employers who, according to Anthem, stand to gain billions of dollars in savings have filed any brief in support of this merger.

. See also Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1433 (9th Cir. 1995) ("Consumer welfare is maximized when eco *371 nomic resources are allocated to their best use, and when consumers are assured competitive price and quality.”) (citing, inter alia, National Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross of Kansas City, 452 U.S. 378, 387-388 & n.13, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981)).

. See also Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 988 (9th Cir. 2000) ("[T]he central purpose of the antitrust laws, state and federal, is to preserve competition. It is competition — not the collusive fixing of prices at levels either low or high — that these statutes recognize as vital to the public interest.”).

. Thus far the courts of appeals —including United States v. Baker Hughes, 908 F.2d 981 (D.C. Cir. 1990), and all of the cases on which the dissenting opinion relies — have only held that efficiencies may be used as part of an evidentiary burden-shifting scheme to rebut the government’s prima facie showing of an anti-competitive merger. No court of appeals has gone as far as Anthem and held that a reduction in costs standing alone greenlights a substantially anticompetitive merger that would otherwise be barred by the Clayton Act. See Federal Trade Comm’n v. University Health, Inc., 938 F.2d 1206, 1222 n.29 (11th Cir. 1991) ("Of course, once it is determined that a merger would substantially lessen competition, expected economies, however great, will not insulate the merger from a section 7 challenge.”); Areeda & Hovenkamp, supra, ¶ 970f, at 42.