**HOSPITAL BUILDING COMPANY, Appellant,**

v.

**TRUSTEES OF The REX HOSPITAL, a Corporation; Joseph Barnes; Richard Urquhart, Jr., Appellees.**

**No. 85–1165.**

United States Court of Appeals, Fourth Circuit.

Argued Oct. 10, 1985.

Decided April 18, 1986.

John K. Train, III (Frank G. Smith, III, H. Stephen Harris, Jr., Alston & Bird, Atlanta, Ga., John R. Jordan, Jr., Charles Gordon Brown, William D. Bernard, Jordan, Brown, Price & Wall, Chapel Hill, N.C., on brief), for appellant.

Ray S. Bolze (Robert J. Brookhiser, Howrey & Simon, Washington, D.C., Noah H. Huffstetler, III, Dean M. Harris, Moore, Van Allen, Allen & Thigpen, Raleigh, N.C., on brief), for appellees.

Before WIDENER and HALL, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

Hospital Building Company (HBC) appeals from a judgment entered on a verdict exonerating the Trustees of Rex Hospital (Rex) and two of its officers from liability under sections 1 and 2 of the Sherman Act, 15 U.S.C. sections 1 and 2.[1] In its principal assignment of error, HBC urges that Rex is not entitled to an affirmative defense for planning activities undertaken in good faith to avoid needless duplication of hospital facilities. Other assignments of error include objections to the court's charge pertaining to the *Noerr-Pennington* doctrine, and numerous evidentiary rulings. We affirm.

---

1. Prior proceedings are reported in *Hospital Building Co. v. Trustees of the Rex Hospital,* 511 F.2d 678 (4th Cir.1975), *rev'd* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (*HBC I*); and 691 F.2d 678 (4th Cir.1982) (*HBC II*).

## I

Hospital Building Company operates the Mary Elizabeth Hospital in Raleigh, North Carolina. Rex operates Rex Hospital, also in Raleigh. HBC claimed that Rex and several conspirators combined in an attempt to block the expansion and relocation of Mary Elizabeth in violation of sections 1 and 2 of the Sherman Act. According to HBC, Rex's conspirators, who were not joined as defendants, included North Carolina Blue Cross and Blue Shield, Inc., the Wake County Hospital System, the Health Planning Council of Central North Carolina, the North Carolina Hospital Association, the Joint Long-Range Hospital Planning Committee of Wake County, and several individuals associated with these organizations. When HBC applied in 1971 to the North Carolina Medical Care Commission for a certificate of need for the Mary Elizabeth expansion, the commission asked the Health Planning Council for recommendations on the proposal.[2] The council opposed certification.

HBC presented evidence in the antitrust trial to support its contention that Rex and other conspirators caused the council to oppose the application for expansion of Mary Elizabeth Hospital. This opposition, HBC contends, was intended to preserve and enhance Rex's competitive position. HBC also claims that after the commission granted its certificate of need, Rex prevailed on the council to appeal to a state court in an effort to delay the expansion.[3] HBC asserts that the council's opposition before the commission and its appeal from the commission's decision—all said to be instigated by Rex and other conspirators— were a sham designed to hinder HBC and to further Rex's anticompetitive goal.

Rex presented evidence to support its position that its opposition to Mary Elizabeth's expansion was undertaken in good faith to avoid unnecessary duplication of hospital facilities and services. It also contends that its opposition to HBC's application in administrative and judicial proceedings was an exercise of its constitutional right to petition the government as defined by *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). It denies that its conduct falls within the exception to the *Noerr-Pennington* doctrine for administrative and judicial activities that are sham.

The court submitted special interrogatories to the jury. In its first three answers, the jury found that Rex had conspired to restrain trade in the market for medical-surgical hospital services in the Raleigh area and had conspired to monopolize and to attempt to monopolize the same market.[4] In answer to the fourth interrogatory, the jury found that Rex had undertaken its planning activities in good faith for the purpose of avoiding needless duplication of health care resources in the Raleigh area. Answering interrogatory number five, the jury found that Rex's opposition in administrative and judicial hearings to HBC's proposed hospital expansion was not a sham.

The court instructed the jury that affirmative answers to interrogatories four and five would exonerate Rex from all liability and that in this event the jury need not consider additional interrogatories dealing with the issues of proximate cause and damages. After the jury returned its verdict for Rex in interrogatories four and five, the district court denied all postverdict motions and entered judgment for Rex.

## II

■ In *HBC II* the court concluded that federal legislation pertaining to planning

---

**2.** The statutory genesis of the Health Planning Council is explained in *HBC II,* 691 F.2d at 684–85.

**3.** The appeal was mooted by *In Re Certificate of Need for Aston Park Hospital, Inc.,* 282 N.C. 542, 193 S.E.2d 729 (1973), which held that North Carolina's certificate of need law violated the state constitution.

**4.** The jury found in favor of the individual defendants, and HBC does not appeal the judgment entered on this aspect of the verdict.

for health services created a narrow rule of reason test "to permit defendants to show, if they can, that participation in certain planning activities that would otherwise violate § 1 might not under the circumstances have been an unreasonable restraint on trade." 691 F.2d at 685. The test is satisfied if the defendants prove by a preponderance of evidence that their planning activities had the purpose "only of avoiding a 'needless' duplication of health care resources...." 691 F.2d at 686.

HBC asserts that the defense recognized in *HBC II* should no longer be allowed because it cannot be reconciled with this court's subsequent en banc decision in North Carolina *ex rel. Edmisten v. P.I.A. Asheville, Inc.*, 740 F.2d 274 (4th Cir.1984). HBC buttresses its argument by emphasizing that *P.I.A.* is firmly bedded on *National Gerimedical Hospital and Gerontology Center v. Blue Cross of Kansas City*, 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981).

Contrary to HBC, we find no incompatibility between *P.I.A.* and *HBC II. P.I.A.* held that 1974 federal legislation did not grant antitrust immunity for hospital mergers approved by the state. The mergers remained subject to a rule of reason test. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 2741, 81 L.Ed.2d 628 (1984). Both *HBC II* and *P.I.A.* relied in part on *National Gerimedical. P.I.A.* stressed the strict standard emphasized in *National Gerimedical* for finding implied repeal of antitrust laws, and *HBC II* adverts to the Court's suggestion that Congress may have intended that some planning activities in the health field are impliedly immune from antitrust attack. *See* 452 U.S. at 388–89 nn. 13, 14 and 393 n. 18, 101 S.Ct. at 2421–22 nn. 13, 14 and 2424 n. 18.

In *P.I.A.* the court does not mention *HBC II,* and the opinion's reliance on *National Gerimedical* cannot be read as disapproving *HBC II.* In view of the different issues and statutes considered in each case, we are not prepared to say that the en banc court impliedly overruled *HBC II.*

In the final analysis, both *P.I.A.* and *HBC II* opted for a rule of reason test for activity in the health care field that each examined.

## III

HBC argues that even if the affirmative defense of *HBC II* remains viable, the district court misapplied it. The court erred, it says, by not granting its motion for a directed verdict with respect to the defense. HBC claims that Rex failed to show that there was no need for additional hospital beds in the community and that its *only* purpose in opposing HBC was to avoid needless duplication of health care facilities. HBC also asserts that the court did not properly instruct the jury on the elements of the defense.

■■■■ HBC is correct in pointing out that there was a shortage of hospital beds in the community of which everyone, including Rex, was aware. But it does not follow that a known shortage of beds precludes planning to avoid needless duplication. Increasing the number of beds is but one aspect of need. Careful planning to satisfy this deficiency without duplicating available services is in harmony with the federal legislation that undergirds the decision of *HBC II.* We conclude, therefore, that Rex's knowledge about the shortage of beds did not foreclose it from participating in planning, even though the planning led to its opposition to HBC. Nor did its knowledge of the shortage deprive it as a matter of law from relying on the affirmative defense recognized in *HBC II.* We also conclude that conflicting evidence about Rex's purpose for participating in joint long-range planning presented a question for the jury. Questions of purpose, like those of motive and intent, rarely can be summarily decided as a matter of law. Consequently, the district court did not err by denying HBC's motion for a directed verdict.

In its instructions the court left no doubt that for Rex to prevail on its affirmative defense it had to prove that its purpose for engaging in joint planning was to avoid

needless duplication. The court explained that Rex had the burden of proof on this issue and that the jury should decide whether duplication was needless by objectively evaluating the health care needs of consumers and not the needs of the planners. We find no error in the instructions. They conformed to the law explained in *HBC II,* and they were adequate for application of the defense to charges brought under both sections 1 and 2 of the Sherman Act.

## IV

In *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court recognized that Congress did not intend the Sherman Act to bar concerted actions of competitors to influence legislative, judicial, or administrative action. "Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." *Pennington,* 381 U.S. at 670, 85 S.Ct. at 1593.[5] Nevertheless, competitors lose the immunity conferred by the *Noerr-Pennington* doctrine if their conduct is a sham. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Professor Areeda has given this explanation of sham that denies a defendant the benefit of the *Noerr-Pennington* doctrine:

> [T]he basic concept, as employed by the Supreme Court, is that the defendant's activity was intended to injure the plaintiff directly rather than through a governmental decision. When the antitrust defendant had not truly sought to influence a governmental decision, his invocation of governmental machinery is a sham. To be sure, he would always be pleased to obtain a governmental decision against his rival. But where he had

no reasonable expectation of obtaining the favorable ruling, his effort to do so was a sham.

P. Areeda, *Antitrust Law,* ¶ 203.1a (Supp. 1982).

Rex claimed it was entitled to the immunity afforded by the *Noerr-Pennington* doctrine when it aided the council in opposing HBC's application for a certificate of need in the commission's administrative proceedings and later when it supported the council's petition for judicial review of the commission's decision. HBC contends that Rex's activities were a sham. It asserts that the court erred by placing on it the burden of proving that Rex's conduct was a sham and that the court's instruction on the issue was flawed.

We find no merit in HBC's objections to the charge. The district court's ruling is supported by Justice Stewart's imposition of the burden of proof on the plaintiff in his concurring opinion in *California Motor Transport,* 404 U.S. at 518, 92 S.Ct at 615; *accord Litton Systems, Inc. v. American Telephone & Telegraph Co.,* 700 F.2d 785, 813 (2d Cir.1983); *MCI Communications Corp. v. American Telephone & Telegraph Co.,* 708 F.2d 1081, 1155 (7th Cir.1983); *Ernest W. Hahn, Inc. v. Codding,* 615 F.2d 830, 843 (9th Cir.1980); *see also* P. Areeda, *Antitrust Law,* ¶ 204.1f at 33 (Supp.1982).

HBC relies on *North Carolina Electric Membership v. Carolina Power & Light Co.,* 666 F.2d 50, 52 (4th Cir.1981), in which, dealing with an issue pertaining to discovery of legislative lobbying activities, we referred to the *Noerr-Pennington* doctrine as an affirmative defense. That case held that the *Noerr-Pennington* doctrine did not bar discovery. It did not deal with the burden of proving a sham, and it does not alter the proposition that the complainant in an antitrust case has the burden of prov-

---

**5.** To the extent that Rex engaged in joint planning activities in a bona fide effort to influence the commission and the court to reject HBC's application for a certificate of need, it would appear that Rex's conduct was protected by the *Noerr-Pennington* doctrine. In view of the jury's verdict on the planning issue, however, we need not determine which joint planning activities were undertaken to oppose HBC in the administrative and judicial proceedings.

ing that its competitor's conduct was a sham.

■ HBC objects to a clause in the charge explaining that actions taken "without a genuine intent to influence the decision of the agency or the court" are a sham. To instruct in terms of "genuine intent," HBC says, could mislead the jury to believe that a mere hope of success would be sufficient to escape the exception to the *Noerr-Pennington* doctrine. HBC also argues that the evidence showed that Rex did not have a genuine intent to influence governmental action.

We do not ascribe to the phrase "genuine intent" the meaning attributed to it by HBC. Read in the context of the entire charge, the phrase "genuine intent" meant a sincere intent without pretense. Justice Stewart expressed the same concept by saying that antitrust complainants "are entitled to prove that the real *intent* of the conspirators was not to invoke the processes of the administrative agencies and courts...." *California Motor Transport*, 404 U.S. at 518, 92 S.Ct. at 615 (concurring opinion) (emphasis in original).

Undoubtedly, the district court could have more clearly instructed the jury by borrowing Professor Areeda's explanation of a sham, which we have previously quoted. *See* P. Areeda, *Antitrust Law*, ¶ 203.-1a (Supp.1982). Nevertheless, we find no reversible error in the court's phrase, "genuine intent." Also, we find no error in HBC's other criticisms of the charge. It substantially followed the *Noerr-Pennington* doctrine and the exception for sham, as described in *HBC II*, 691 F.2d at 687–88.

■ We reject the contention that Rex had no genuine intent to influence governmental action. On this issue the evidence was in conflict. Without recounting all of the proof, we note that the propriety of submitting the issue to the jury is illustrated by the testimony of a member of the commission that granted HBC's application. He testified that the decision was not "open and shut," and he explained that opposition to the application raised points

that "were well taken, carefully thought out and well presented. There simply seemed to be an honest variance of opinion...."

## V

HBC has assigned numerous errors to the trial court's admission and exclusion of evidence. We conclude that none warrant reversal, and only two merit discussion.

■ HBC contends that the court erred in refusing to admit into evidence the handwritten notes of Kevin Rick, which apparently were made during a Health Planning Council meeting. HBC claims that the notes show that the planning activities of Rex and other conspirators were undertaken in bad faith. At the time the notes were taken, Rick was a graduate student at Duke University and was not connected with any of the parties or conspirators. Rick testified that he could not recall the specific meeting at which he took the notes, that the notes were not intended to be a transcript of the meeting, that he had no independent memory of the meeting, and that he could not now make much sense of the notes.

The notes were hearsay. Rick's testimony did not provide an adequate foundation for treating them as admissions encompassed by Fed.R.Evid. 801(d)(2)(A) or (E). Also, his testimony was an insufficient foundation to bring the notes within the exception of Rule 803(1). We therefore conclude the trial court did not err in refusing to admit the notes. *See Dickinson Supply, Inc. v. Montana-Dakota Utilities Co.*, 423 F.2d 106, 109 (8th Cir.1970).

■ HBC contends that the district court did not allow it to put on its rebuttal case, particularly with respect to the testimony given by Rex's expert. HBC's case-in-chief took ten weeks to present. The defendants' case took most of two additional weeks. After nearly 12 weeks of trial, the district court limited HBC's rebuttal to testimony which had unfairly surprised it. It is clear from colloquies between the court and HBC's attorneys that much of HBC's

proffered rebuttal involved recalling its witnesses in order to highlight their differences with Rex's expert. The court, however, did allow HBC to present four rebuttal witnesses. In these circumstances, the district court did not abuse its discretion when it limited HBC's rebuttal case. *See Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976) (dictum).

We have considered HBC's other numerous assignments of error and find in them no grounds for reversal. The judgment of the district court is affirmed.