865 F.2d 1257
 1988-2 Trade Cases 68,380
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
DIXIE-NARCO, INC., a West Virginia Corporation; Magic Chef,
Inc., a Delaware Corporation; Maytag Company, a
Delaware Corporation, Plaintiffs--Appellants,
v.
Roy S. STEELEY, Defendant--Appellee.
DIXIE-NARCO, INC., a West Virginia Corporation; Magic Chef,
Inc., a Delaware Corporation; Maytag Company, a
Delaware Corporation, Plaintiffs--Appellees,
v.
Roy S. STEELEY, Defendant--Appellant.
 Nos. 87-1743, 87-1744.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 3, 1988.
Decided: Dec. 16, 1988.
 
 Thomas H. Morsch (Stephen C. Carlson, James A. Huttenhower, Sidley & Austin; Joanne F. Alper, Charles S. Russell, Jr., Cohen, Gettings, Alper & Dunham, on brief), for appellants.
 Glenn Richard Reichardt (Charles Lee Eisen, Kirkpatrick & Lockhart; James T. Hosmer, Nixon & Vanderhye, P.C., on brief), for appellee.
 Before DONALD RUSSELL, MURNAGHAN and SPROUSE, Circuit Judges.
 SPROUSE, Circuit Judge:
 
 
 1
 Dixie-Narco, Inc., filed this action against its former president, Roy Steeley, who, after resigning his corporate position, organized a competing business. It alleged that he breached his corporate fiduciary obligations, conspired with other Dixie-Narco employees to breach corporate obligations, and breached a Deferred Compensation Agreement. After Steeley's original counterclaim was dismissed, he filed an amended counterclaim demanding payments due him under the Deferred Compensation Agreement. After summary judgment and directed verdict rulings by the district court, Dixie-Narco's breach of fiduciary obligations claim and Steeley's counterclaim for deferred compensation payments remained for jury consideration. The jury found for Steeley on both issues. After trial, the district court denied Dixie-Narco's motion for judgment n.o.v. and its demand for an injunction restraining Steeley from competing with it. The court also denied Steeley's request for additional equitable relief. Dixie-Narco, bringing this appeal, contests numerous district court rulings. Steeley cross-appeals, likewise assigning multiple grounds of error.
 
 
 2
 Dixie-Narco is engaged in the business of manufacturing and selling soft drink vending machines.[1] Roy Steeley was employed by Dixie-Narco beginning in 1957 and served as President and as a member of its Board of Directors from 1970 until January 31, 1987, when he left the company. Steeley also served as a Vice-President of Magic Chef from 1979 until January 31, 1987, and as a member of Magic Chef's Board of Directors. He was a member of the Board of Directors of Maytag from the time of the Magic Chef/Maytag merger in May 1986 until January 31, 1987.
 
 
 3
 The controversy leading to this litigation arose after the merger. Steeley's apparent popularity as a chief executive officer extended to both Dixie-Narco employees and corporate officers of both Magic Chef and Maytag. He was regarded as a key to the success earned by Dixie-Narco during the latter years of his tenure. Some time after the Maytag merger, however, Steeley contemplated retirement and concomitantly considered the possibility of creating his own company, competing directly with Dixie-Narco in the production and sale of soft drink vending machines. In the spring and summer of 1986, Steeley approached other Magic Chef officers and broached the idea of themjoining him in the formation of a new competing company. They eventually declined Steeley's overtures.
 
 
 4
 In the fall of 1986, Steeley specifically made known his plans to retire in January of 1987. He also advised officers of both Magic Chef and Maytag that he intended to form a new company competing with them and requested permission to solicit key Dixie-Narco employees to work for the new company. That permission was denied him, and there is no evidence that he persisted in such recruiting efforts. Steeley retired on January 31, 1987. Throughout the fall of 1986 he and associates actively prepared for the formation of a new company. The company, Royal Vendors, Inc., was formally organized in early March 1987.
 
 
 5
 Central to the controversy between Dixie-Narco and Steeley is a Deferred Compensation Agreement executed between Steeley and Magic Chef in 1980, when there were happier relations between them. It provided, among other things, that, upon "attaining age 65 while in the employ of the Company," Steeley, upon retirement, would be eligible for annual deferred compensation. It is undisputed that his rights under that agreement vested when he became 65 in 1984. Steeley agreed, however, that he would not "directly or indirectly, own, manage, operate, control, be employed by or participate in the ownership, management, operation or control of, or be connected in any manner with any business of the type and character engaged in and competitive with that conducted by [Magic Chef] at the time of such termination." The agreement further provided that if Steeley engaged in a competitive business, he "shall forfeit any and all rights to benefits hereunder even if such benefits are vested ... or payments to [Steeley] had commenced."[2] Dixie-Narco began monthly payments, but halted the payments a few months after filing this action in February 1987.
 
 
 6
 In Count I of its complaint, Dixie-Narco sought damages for Steeley's alleged breach of his fiduciary obligation when he organized the competing business. In Counts II and III, it alleged that he had breached the Deferred Compensation Agreement and conspired with other Dixie-Narco employees to breach his obligations. Steeley answered and counterclaimed, alleging that plaintiff interfered with his prospective business relations and violated sections 1 and 2 of the Sherman Antitrust Act. On plaintiff's motion, the district court dismissed Steeley's counterclaim, but subsequently allowed him to file a new counterclaim simply alleging breach of the Deferred Compensation Agreement. The court granted Steeley's motion for summary judgment on Count II of Dixie-Narco's complaint. That Count was based on the covenant not to compete and forfeiture clause contained in the Deferred Compensation Agreement. The court held those clauses invalid as a matter of law. At the conclusion of Dixie-Narco's evidence at trial, the district court granted Steeley's motion for a directed verdict on Dixie-Narco's Count III conspiracy claim. The case was then submitted to the jury on Count I of the complaint alleging a breach of Steeley's fiduciary obligations, and on the single count of the counterclaim in which Steeley alleged nonpayment of the deferred compensation payments. The jury ruled in favor of Steeley on both issues and awarded him $11,666.67 in damages for unpaid deferred compensation payments.
 
 
 7
 Dixie-Narco contends that the district court erred in denying its request for an injunction prohibiting Steeley from using its confidential information, in failing to instruct the jury that Steeley had the burden of proving that he did not breach his fiduciary duty, in granting Steeley's motion for a directed verdict on its conspiracy claim, and in granting summary judgment to Steeley on the part of its complaint which attempted to nullify Steeley's rights under the Deferred Compensation Agreement. Steeley contends that the district court erred in dismissing his original counterclaim.
 
 
 8
 The district court properly dismissed Steeley's counterclaim alleging interference with his business activities in violation of the Sherman Antitrust Act, 15 U.S.C.A. Secs. 1, 2 (Supp.1988). Despite Steeley's protestations to the contrary, his antitrust and business interference allegations focused almost exclusively on interference by Dixie-Narco's litigation efforts. The district court properly ruled that Dixie-Narco had a protected right to pursue judicially its claims against Steeley. See California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972). The district court held, and we agree, that the corporation's litigation efforts did not fall within the "sham" exception to the Noerr-Pennington doctrine. See Allied Tube & Conduit Corp. v. Indian Head, Inc., 486 U.S. ----, 108 S.Ct. 1931, 1937 n. 4 (1988); Vendo Co. v. Lektro-Vend Corp., 433 U.S. 623, 635 n. 6 (1977) (plurality); Otter Tail Power Co. v. United States, 410 U.S. 366, 380 (1973); California Transport, 404 U.S. at 513; Hospital Bldg. Co. v. Trustees of Rex Hosp., 791 F.2d 288, 292 (4th Cir.1986).
 
 
 9
 In our view, the district court was also correct in directing a verdict in favor of Steeley on Dixie-Narco's conspiracy claim; in its instructions to the jury on the burden of proving a breach of Steeley's fiduciary duty; and in denying Dixie-Narco's request for an injunction. In our view, however, the court erred in granting summary judgment to Steeley on the deferred compensation issue.
 
 
 10
 As to its conspiracy argument, Dixie-Narco contends on appeal that Steeley conspired with its employees to violate their fiduciary duties and to obtain competitive advantages with Dixie-Narco's customers in favor of the new corporation, Royal Vendors. There is no question that Steeley had intimate knowledge of customer personnel key to selling vending machines, and he appears to have commanded their respect. Dixie-Narco, however, presented no evidence that Steeley conspired with anyone to enhance that relationship for the benefit of Royal Vendors at the expense of Dixie-Narco. There was considerable evidence at trial concerning a Vice-President of Dixie-Narco who frequently traveled with Steeley, had special knowledge of the more profitable customers, and subsequently resigned to join Royal Vendors. Dixie-Narco contends that this evidence implies the conspiracy sufficiently to withstand a directed verdict. We disagree; there was simply no evidence of the conspiracy claimed by Dixie-Narco.
 
 
 11
 Likewise, we cannot say that the district court erred in refusing to issue an injunction prohibiting Steeley from using Dixie-Narco confidential information. At the request of both parties, the court made a factual finding on this injunction issue. It found that there was no evidence that Steeley converted confidential information of Dixie-Narco to his own use in establishing Royal Vendors, or that while employed by Dixie-Narco he solicited any customer for business or any employee of Dixie-Narco to join Royal Vendors. It also found that Dixie-Narco did not lose sales, customers, income, or business opportunities as a result of Steeley's activities. In our view, those findings are not clearly erroneous.
 
 
 12
 At trial, Dixie-Narco requested an instruction placing the burden on Steeley to prove that he did not breach his fiduciary responsibility to his employer corporation. The allegation of that breach, however, was the crux of the Dixie-Narco complaint that the jury considered. Dixie-Narco concedes that, as pleaded, it had the ultimate burden of proving its claim. It contends, however, that, due to the high standards of fidelity expected of a fiduciary and even where a breach is alleged by another party, the fiduciary must prove that his activities were not tainted. The district court made a finding, however, that "[t]he preponderance of the evidence is that Steeley ... did not take unfair advantage of his position as president of Dixie-Narco to establish Royal Vendors." In our view, this finding also is not clearly erroneous. The import of the finding is that, even if Steeley had the burden, he met it.
 
 
 13
 We agree with Dixie-Narco, however, that the district court erred in granting summary judgment to Steeley on its claim that he violated the Deferred Compensation Agreement. The restrictive covenant in the agreement prohibited Steeley from being employed by or participating "in any manner with any business of the type and character engaged in and competitive with that conducted by [Magic Chef]." The district court considered that the unlimited scope of this restrictive covenant rendered it invalid, and we, of course, agree with that assessment. The district court went on to hold, however, that "I don't see that [the restrictive covenant is] any more valid when analyzed from a forfeiture of the retirement benefits aspect than for [sic] an employment aspect." The Deferred Compensation Agreement specified Georgia law to govern any dispute arising under it. The parties at trial, however, treated the issue as if it were governed by Virginia law. Whichever authority is applied, the result is the same.
 
 
 14
 As we interpret the law of Georgia in this context, the forfeiture clause was not invalid as a matter of law. The Georgia Constitution declares that any contract or agreement that "may have the effect of or which is intended to have the effect of defeating or lessening competition" is unlawful and void. Ga. Const., art. III, sec. VI, par. V (1983). Further Ga.Code Ann. Sec. 13-8-2 provides in part: "(a) A contract which is against the policy of the law cannot be enforced. Contracts deemed contrary to public policy include but are not limited to ... (2) Contracts in general restraint of trade...." The controlling case is Collins v. Storer Broadcasting Co., 120 S.E.2d 764 (Ga.1961), which held that a provision for the forfeiture and divestment of profit-sharing rights narrower than the instant provision was not unenforceable as a restraint of trade, on the rationale that the provision operated merely as a forfeiture and was not invoked to bar employment. Id. at 770. Collins has been taken to stand for the proposition that
 
 
 15
 a provision of a contract which imposes as a condition to the recovery of benefits under a deferred compensation plan that the employee refrain from engaging in competitive employment is not violative of public policy as being in restraint of trade.
 
 
 16
 Sheppard v. Columbus Packaging Co., 245 S.E.2d 887, 888 (Ga.App.1978) (provision that "the Employee will not directly or indirectly engage in any business competitive with the business then being conducted by the Company in any area in which such business is then being conducted" upheld). See also Brown Stove Works v. Kimsey, 167 S.E.2d 693, 694-95 (Ga.App.1969) (provision barring "activity ... deemed by the company to be competitive with the business of the company" upheld); Kem Mfg. Corp. v. Sant, 355 S.E.2d 437 (Ga.App.1987). Virginia law, although less fully developed, is not inconsistent with Georgia law. Nationwide Mutual Ins. Co. v. Tatem, 173 S.E.2d 818, 819 (Va.1970) (provision that an employee not "induce, or attempt to induce, any existing policyholders to replace, lapse, forfeit or cancel any policies issued by the Companies" was enforced); see also Rochester Corp. v. Rochester, 450 F.2d 118 (4th Cir.1971).
 
 
 17
 In view of the above, we affirm all the district court's rulings except its grant of summary judgment to Steeley on the Deferred Compensation Agreement, and remand to the district court for proceedings not inconsistent with this opinion.
 
 
 18
 AFFIRMED IN PART, REMANDED IN PART.
 
 
 
 [1]
 Dixie-Narco was a wholly-owned subsidiary of Magic Chef when Magic Chef merged into Maytag Corporation in mid-1986. At the time of the action below, it was one of several operating companies within the Maytag corporate complex
 
 
 [2]
 At the time of Steeley's retirement he earned approximately $800,000 per year from Dixie-Narco and Magic Chef, and had recently exercised stock options that yielded a taxable income of $352,000. At retirement, he received a cash severance payment of $250,000 and a retirement benefit of $73,000 per year for five years ($68,000 per year thereafter), in addition to the contractual agreement providing for deferred compensation of $35,000 a year