**Thomas G. BOND, Individually and as the General Partner of Dubuque T.V. Limited Partnership, and William Morris Abernathy, Appellees,**

v.

**CEDAR RAPIDS TELEVISION COMPANY, Appellant.**

No. 92–1434.

Supreme Court of Iowa.

June 22, 1994.

Stephen J. Holtman, Iris E. Muchmore, and Carolyn M. Hinz of Simmons, Perrine, Albright & Ellwood, Cedar Rapids, for appellant.

G. Stephen Wiggins of Roberts, Davidson, Wiggins & Crowder, Tuscaloosa, AL, and David J. Dutton, Thomas L. Staack, and Bruce L. Braley of Dutton, Braun, Staack, Hellman & Iversen, P.L.C., Waterloo, for appellees.

Considered by HARRIS, P.J., and LARSON, NEUMAN, SNELL, and ANDREASEN, JJ.

HARRIS, Justice.

A Dubuque television station recovered a substantial verdict against a Cedar Rapids television station in this tort suit for interfering with a contract. We set aside the recovery because we find as a matter of law that the actions complained of were protected under a principle rooted in the First Amendment to the United States Constitution.

Although the plaintiffs vigorously dispute the point, we are convinced the appeal calls for application of the principle of issue preclusion. The application is interesting, though certainly not unique, because it overcomes the rubric that, on appeal, disputed facts are taken in the light most consistent with the verdict. *See* Iowa R.App.P. 14(f)(2). In this case the parties presented diametrically opposed versions concerning which parties to the dispute were victims of the other's culpability. By its verdict the jury resolved that conflict (we do not reach the challenges to certain trial rulings that preceded the verdict) in favor of the plaintiffs who would

ordinarily have the advantage of their version of the facts. Under the issue preclusion principle they are denied this advantage, however, because their version of a crucial element had already been considered and rejected by another tribunal in preliminary litigation.

The Dubuque Television Limited Partnership (DTV), a plaintiff, bought an ABC affiliate television station, KDUB–TV, for $3.25 million in 1985. Thomas Bond, a second plaintiff, is DTV's general partner. At the time, the Dubuque cable system was authorized by the federal communications commission (FCC) to provide KDUB with nonduplication protection. This protection allowed the cable system to black out transmissions of other ABC affiliates on the system when their programming through the national ABC network duplicated that offered by KDUB. Cedar Rapids Television Co. (CRTV), the defendant, owned KCRG–TV, an ABC affiliate on the system that was subject to blackout.

At the time of purchase in 1985, Bond was aware of the FCC-approved protection and thereafter chose not to seek extension of the FCC order when it expired in January of 1986. Even though the order expired, a Dubuque city cable ordinance continued to provide blackout protection. All parties agreed the ordinance was unenforceable, but the cable system retained the protections. CRTV officials vigorously protested the protections, while DTV and the City of Dubuque supported them.

DTV persuaded the cable system to retain the blackout and either remove KCRG from the system or move it to a higher channel. In 1987 the cable system was purchased by TCI Cablevision, which, in March of 1988, announced it would terminate protection. At the same time TCI moved KCRG to a higher channel. Such a move is highly undesirable because viewers are less likely to watch stations at higher channels.

Prior to this announcement DTV entered into an agreement to sell KDUB to Sage Broadcasting Corporation (Sage) for $4 million. DTV then filed a copy of the agreement with the FCC.

The agreement contained a clause that stated "pursuant to a verbal agreement with the local cable company, the said cable company blacks out station KCRG–TV, Cedar Rapids, Iowa, whenever said station's programming is identical with that of the station." After obtaining a copy of the agreement and upon seeing this clause, CRTV filed a petition with the FCC to deny DTV's application to transfer its license. This petition was the catalyst for the present litigation. In its petition CRTV alleged the nonduplication "verbal agreement," referenced in the transfer agreement, violated FCC nonduplication rules and antitrust laws. CRTV requested denial of the transfer and a review of DTV's fitness as an FCC licensee.

DTV filed an "opposition" to the petition, following which the video services division, mass media bureau, of the FCC, issued a memorandum opinion and order denying the petition and allowing the transfer. The denial was affirmed on intra-agency appeal to the FCC commission members.

Shortly after the FCC final ruling, DTV countered by filing a petition seeking revocation of CRTV's license. DTV claimed CRTV was unfit to be a licensee because its petitions, in seeking denial of the transfer, were said to be baseless and filed only to delay or destroy a license transfer. The FCC rejected this abuse of process argument and, in the matter that controls this suit, found that CRTV raised colorable allegations of uncompetitive conduct.

The proposed transfer of KDUB to Sage collapsed in October 1989 after an agreed deadline passed. DTV then filed this action, alleging CRTV tortiously interfered with the transfer contract.

After a lengthy trial the jury awarded $2.1 million on the interference claim and $10,000 to Bond individually for his emotional distress. CRTV appealed and DTV cross-appealed. Because this was a law action we review the district court's determination for error. Iowa R.App.P. 4.

■ I. The core issue in the case is the applicability of the *Noerr* doctrine which provides that civil liability may not be imposed on a party for exercising the right, under the

First Amendment to the United States Constitution, to petition for governmental action. *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 138, 81 S.Ct. 523, 530, 5 L.Ed.2d 464, 471 (1961). Defendant CRTV contends this doctrine covered its activities before the FCC and immunized it from liability.

CRTV raised the *Noerr* doctrine in its motion for directed verdict, motion for judgment notwithstanding the verdict and motion for new trial. CRTV also objected to the district court's refusal to include a *Noerr*-based jury instruction. CRTV did not however raise the doctrine in its answer or in a motion for summary judgment. In the belief that the doctrine is an affirmative defense, the plaintiffs contend CRTV did not preserve error on the question in accordance with Iowa rule of civil procedure 101.[1]

█ We have defined an affirmative defense as "one resting on facts not necessary to support plaintiff's case." *Erickson v. Wright Welding Supply, Inc.,* 485 N.W.2d 82, 86 (Iowa 1992); *Foods, Inc. v. Leffler,* 240 N.W.2d 914, 920 (Iowa 1976). Under Iowa rule of civil procedure 101 these matters must be specially pleaded, and a motion for directed verdict or a motion for judgment notwithstanding the verdict do not qualify as special pleadings. *Foods,* 240 N.W.2d at 920. Without such a pleading, the question may not be entertained on appeal. *Id.*. Further, mere denials of specific paragraphs in plaintiffs' petition are insufficient to raise affirmative defenses.[2]

█ Although plaintiffs contend otherwise, we are convinced the *Noerr* doctrine is not an affirmative defense, but rather an element of plaintiffs' recovery in an action of this kind. *McGuire Oil Co. v. MAPCO, Inc.,* 958

F.2d 1552, 1559 n. 9 (11th Cir.1992); *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 791 F.2d 288, 292–93 (4th Cir.1986); *see Litton Sys., Inc. v. AT & T Co.,* 700 F.2d 785, 810 (2d Cir.1983); *Defino v. Civic Ctr. Corp.,* 780 S.W.2d 665, 668 (Mo.App.1989); Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* § 203.4C, at —— (1992). The burden is clearly on the plaintiffs to raise and negate *Noerr* immunity. *MAPCO,* 958 F.2d at 1558 n. 9 (stating plaintiff has burden to show *Noerr* immunity did not attach to plaintiff's action); *Hospital Bldg. Co.,* 791 F.2d at 292–93 (stating that "complainant in an antitrust case has burden of proving that its competitor's conduct was a sham"); *Defino,* 780 S.W.2d at 668 (*Noerr* doctrine is an essential element in plaintiff's case, not an affirmative defense borne by defendants).[3]

Although we have not previously been called upon to apply the *Noerr* doctrine, the federal authorities holding it not to be an affirmative defense, and in placing the burden on the plaintiffs, are consistent with our holding in a somewhat analogous situation. *Erickson,* 485 N.W.2d at 86 (statutory immunity from suit not an affirmative defense, but part of plaintiff's burden to establish strict liability).

We hold the *Noerr* doctrine is not an affirmative defense and find the issue was preserved.

II. As originally stated in 1961, the *Noerr* doctrine provided that "the Sherman Act does not prohibit ... persons from associating together in an attempt to persuade the legislature or the executive branch to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr,* 365 U.S. at 136, 81 S.Ct. at 529, 5 L.Ed.2d at 470. While initially applied only to antitrust actions, the doctrine was later

1. Iowa rule of civil procedure 101 provides in pertinent part: "Any defense ... which alleges any matter in justification, excuse, release or discharge, or which admits the facts of the adverse pleading but seeks to avoid their legal effect, must be specially pleaded."

2. Plaintiffs cite *Foods, Inc.* for the proposition that all First Amendment protections must be raised prior to the close of trial. *Foods, Inc.* does not stand for such a broad proposition. It

merely holds that, when a First Amendment *does* constitute an affirmative defense, it must be properly raised under rule 101 in order to preserve error. *Foods, Inc.,* 240 N.W.2d at 920–21.

3. Plaintiffs cite only one case they claim to be contra: *North Carolina Elec. Membership Corp. v. Carolina Power & Light Co.,* 666 F.2d 50, 52 (4th Cir.1982). Plaintiffs' interpretation of *North Carolina* was however rejected by the 4th circuit in *Hospital Building Co.,* 791 F.2d at 292–93.

extended to "the approach of citizens ... to administrative agencies ... and the courts." *California Motor Transp. Co. v. Trucking, Unltd.,* 404 U.S. 508, 510, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642, 646 (1972).

Since *California Motor Transport,* the federal courts have expanded the doctrine to claims of tortious interference with contract. *Missouri v. National Org. for Women, Inc.,* 620 F.2d 1301, 1316–17 (8th Cir.), *cert. denied,* 449 U.S. 842, 101 S.Ct. 122, 66 L.Ed.2d 49 (1980); *Havoco of Am., Ltd. v. Hollobow,* 702 F.2d 643, 649–51 (7th Cir.1983); *Surgidev Corp. v. Eye Technology, Inc.,* 625 F.Supp. 800, 803 (D.Minn.1986); *see also Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530, 551 (5th Cir.1978) (petitioning activity protected from state law liability as well as federal antitrust liability), *cert. denied,* 444 U.S. 924, 100 S.Ct. 262, 62 L.Ed.2d 180 (1979). The California Supreme Court has also extended the doctrine. *Pacific Gas & Elec. v. Bear Stearns & Co.,* 50 Cal.3d 1118, 1134–37, 270 Cal.Rptr. 1, 10–12, 791 P.2d 587, 596–98 (1990). These extensions are not only supported by *Noerr,* but also by the underlying right to petition government under the First Amendment.

Plaintiffs point out that the doctrine is subject to what is called the "sham" exception. Immunity is withheld from those situations where the petitioning activity, "extensively directed towards influencing government action, is a mere sham to cover ... an attempt to interfere directly with the business relationships of the competitor." *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533, 5 L.Ed.2d at 475. Until 1993 the standard by which sham analysis proceeded was not clearly defined by the United States Supreme Court, although *Noerr* was thought to be informative.

Under an opinion filed after trial of this case in district court, it is now clear that conduct does not qualify as a sham unless it is objectively baseless. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* —— U.S. ——, —— – ——, 113 S.Ct. 1920, 1927–28, 123 L.Ed.2d 611, 622–24 (1993). The definition of "sham litigation" is now understood to have two parts. First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could

realistically expect success on the merits." *Id.* at ——, 113 S.Ct. at 1928, 123 L.Ed.2d at 624. If the litigation is objectively baseless the court should look to the subjective intent and ask "whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor ... through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* Under this formulation intent is irrelevant where the underlying suit or petition is not itself "objectively baseless." We note that the trial court did not have advantage of the *Columbia Pictures* opinion in making its challenged trial rulings.

III. In applying the sham exception to the present case the question becomes whether CRTV's FCC petitions were objectively baseless. If as a matter of law they were not, the judgment must be reversed. If as a matter of law the petitions were a baseless sham, we must turn to CRTV's other assignments of error.

In denying CRTV's petition, the FCC found that *allegations* of anticompetitive conduct are insufficient to disqualify a licensee, that a prior *adjudication* of anticompetitive practices by another tribunal is required before the FCC will consider anticompetitive activity with respect to character determination (unless circumstances shock the conscience or would evoke universal disapprobation). In denying DTV's subsequent petition against CRTV, the FCC acknowledged that petitions to deny may be filed by interested parties, including competing broadcasters. Significantly, the FCC expressly found that "we cannot say in this case that 'there was an absence of any reasonable basis' for CRTV's allegations. CRTV raised colorable allegations of anticompetitive conduct by DTV which, in proper circumstances, is an area of legitimate commission concern." *In re Dubuque T.V. Ltd. Partnership,* 4 F.C.C.Rcd. 1999 (1989).

CRTV contends this FCC determination bound the district court through the

doctrine of issue preclusion.[4] The doctrine prevents parties to an action in which a judgment has been entered from relitigating in a subsequent action issues raised and resolved in the previous action. *Hunter v. City of Des Moines,* 300 N.W.2d 121, 123 (Iowa 1981). The four prerequisites to application of the doctrine are

(1) The issue precluded must be identical;

(2) The issue must have been raised and litigated in the prior action;

(3) The issue must have been material and relevant to the disposition of the prior action; and

(4) The determinations made of the issue in the prior action must have been necessary and essential to the resulting judgment.

*Id.* Only the first element (identical issue) and the second element (previously litigated) are in dispute here.

The first (identical issue) prerequisite is disputed on the claim that differing standards of proof are implicated. Plaintiffs contend their burden before the agency was greater than a preponderance of evidence, the standard for this litigation in district court. This is a crucial issue because, if the plaintiff did indeed face a higher standard of proof in the prior FCC proceeding than here, the issue is not precluded by the FCC determination.

██ The FCC determination involved plaintiff DTV's allegations before the FCC that CRTV's actions before that commission constituted an abuse of process warranting sanctions. Authorities make it clear that DTV's burden was to establish its claim only by a preponderance of the evidence. In the absence of a special statute establishing a higher standard, the burden in federal administrative proceedings is a preponderance of evidence. *Steadman v. SEC,* 450 U.S. 91, 102, 101 S.Ct. 999, 1007, 67 L.Ed.2d 69, 79 (1981); *Bender v. Clark,* 744 F.2d 1424, 1429 (10th Cir.1984); 2 Am.Jur.2d *Administrative Law* § 363, at 364 (1994); *see also In re High Sierra Broadcasting, Inc.,* 96 F.C.C.2d 423 (1983).[5]

██ Some question might persist on the commonality of issues prerequisite because of language in the FCC ruling. The FCC order refers to a "high burden" on those alleging abuse of process. Plaintiffs cite this language and argue the burden placed on them was higher before the FCC. The quoted language does not indicate the higher standard was employed. The language referred to the nature of the elements making up a showing for an abuse of process before the FCC. It clearly did not refer to the evidentiary standard required to prove those elements.[6]

The standard of proof in this action in Iowa district court is also, of course, a preponderance of the evidence. Iowa R.App.P. 14(f)(6).

The FCC held that DTV had failed to establish the "absence of any reasonable basis for CRTV's allegations," and that "CRTV raised colorable allegations [in] an area of legitimate commission concern." In order to avoid application of the *Noerr* doctrine under the sham exception, DTV is required to show

---

4. Final determinations of administrative agency acting in a judicial capacity are to be accorded preclusive effect in substantive judicial proceedings. *Toomer v. Iowa Dep't of Job Serv.,* 340 N.W.2d 594, 598 (Iowa 1983). Plaintiffs do not object to the general applicability of issue preclusion analysis in this case.

5. A higher standard is usually reserved for situations where particularly important constitutional rights, such as deportation, are at stake. When this type of interest is implicated a clear and convincing evidentiary standard is generally utilized. *See Woodby v. Immigration & Naturalization Serv.,* 385 U.S. 276, 286–87, 87 S.Ct. 483, 488–89, 17 L.Ed.2d 362, 369 (1966). There is no

claim here by any party that such an interest was involved in the proceedings before the FCC.

6. In context, the phrase read:
The factors set out above concerning the pleading requirements for strike petition allegations impose a high burden on those seeking to raise a strike petition issue. With regard to the matters DTV has alleged, we reviewed the CRTV pleading individually and cumulatively. Considering all the facts and circumstances of this matter, we cannot find that DTV has presented a substantial question of fact requiring a hearing with respect to abuse of process by CRTV.
*Dubuque T.V.,* 4 F.C.C.Rcd. 1999.

the same thing. Both showings are to be established by a preponderance of the evidence.

 We conclude that CRTV has established identity of issues and proceed to the second contested element (whether the issue was previously litigated).

IV. Plaintiffs also contend the second prerequisite for issue preclusion (previously litigated) was not met. Plaintiffs note that the FCC order was a denial of hearing with respect to their abuse of process claim. Because no hearing was held, the plaintiffs argue they could not have "litigated" the issue.

The FCC order was essentially a summary judgment on the pleadings and papers submitted. The plaintiffs did not appeal so the order became a final agency determination. We think the FCC determination on submission of DTV's request for sanction satisfies the second prerequisite. The plaintiffs had a chance to further litigate the question, but declined. They are barred from relitigating this in the same manner as any party subject to summary judgment. *Bascom v. Jos. Schlitz Brewing Co.*, 395 N.W.2d 879, 884 (Iowa 1986); 73 Am.Jur.2d *Summary Judgment* § 40, at 768 (1974).

V. What we have said renders all other issues moot, including both those on appeal and cross-appeal.[7] CRTV's motions for directed verdict should have been sustained.

**REVERSED ON THE APPEAL; AFFIRMED ON THE CROSS–APPEAL.**

---

7. On cross-appeal plaintiff Bond complains he was entitled to prejudgment interest. Under our holding he is not entitled to judgment so the claim for any interest also fails.